CELIA GALLIN and Others, Plaintiffs, *v.* NATIONAL CITY BANK OF NEW YORK and Others, Defendants.

Supreme Court, New York County, June 15, 1934.

*David L. Podell* and *Hays, Podell & Shulman,* for the plaintiffs.

*Lupka & Pomerantz,* for the plaintiff Celia Gallin.

*Samuel A. Mehlman,* for the plaintiff Ethel Mehlman.

*Shaine & Weinrib* [*I. Gainsburg* and *Benjamin Seligman* of counsel], for the plaintiff Ann Bashlow.

*Liebman, Blumenthal & Levy,* for the plaintiffs Sarah Cohen and another.

*Tolins & Jakobson,* for the plaintiff Morris B. Goldberger.

*Davis, Polk, Wardwell, Gardiner & Reed* [*John W. Davis* and *Porter R. Chandler* of counsel], for the defendants Behn and Franklin.

*O'Brien, Boardman, Hewitt, Memhard & Early* [*John Vance Hewitt* of counsel], for the defendant Gayer G. Dominick.

*Taylor, Blanc, Capron & Marsh* [*C. A. Capron* and *George S. Mittendorf* of counsel], for the defendant James H. Perkins.

*Dunnington, Gregg & Church* [*T. J. Miller* of counsel], for the defendant Percy R. Pyne, 2d.

*Proskauer, Rose & Paskus* [*Joseph M. Proskauer* and *J. Alvin Van Bergh* of counsel], for the defendants Winthrop and Deeds.

*Donovan, Leisure, Newton & Lumbard* [*J. Edward Lumbard, Jr.*, and *William J. Donovan* of counsel], for the defendants Rentschler and Simonson.

*Curtis, Mallett-Prevost, Colt & Mosle* [*Henry A. Stickney* and *Hugo Kohlman* of counsel], for the defendant Milliken.

*Moore & Bell* [*W. M. Carden* of counsel], for the defendant Winston.

*Cotton, Franklin, Wright & Gordon* [*Thurlow M. Gordon* and *John Cahill* of counsel], for the defendant Swope.

*Zalkin & Cohen* [*Harry Zalkin* and *B. B. Fensterstock* of counsel], for the defendants Hugh B. Baker and Lee Olwell.

*Regan & Barrett* [*John N. Regan* of counsel], for the defendant Edward F. Barrett.

*Le Boeuf & Winston* [*R. J. Le Boeuf, Jr.*, and *Thomas F. Fennell* of counsel], for the defendant Carlisle.

*Northrop, Schur & Sylvester* [*C. P. Northrop* and *R. P. Schur* of counsel], for the defendant Swenson.

*Beardsley & Taylor* [*Thomas H. Beardsley* of counsel], for the defendants Cary and Garver.

*Chadbourne, Stanchfield & Levy* [*Leonard P. Moore* of counsel], for the defendant Charles E. Mitchell.

*Milbank, Tweed, Hope & Webb* [*Edward N. Perkins* of counsel], for the defendant Joseph P. Grace.

*Alexander & Green* [*C. P. Williamson* of counsel], for the defendant Percy A. Rockefeller.

*John E. Mack*, for James A. Stillman.

*McLaughlin & Stickles* [*Chester B. McLaughlin* and *Lester D. Stickles* of counsel], for the defendant National City Bank of New York.

DORE, J. This action was commenced by plaintiffs on February 27, 1933, for an accounting and claimed damages resulting from alleged breach of duty of defendants as directors and officers of the National City Bank of New York (hereinafter referred to as the

bank) and of the National City Company, the name of which is now changed to the City Company of New York, Inc. (hereinafter referred to as the company).

The bank was established in 1812 and in 1865 was chartered as a national banking association for general commercial banking under the National Bank Act.

The company is a New York stock corporation chartered in 1911 and authorized to conduct the business of investing in securities, underwriting issues of stocks and bonds, and dealing in shares of stock and other securities. The company is a subsidiary or affiliate of the bank, and all its stock is owned by three trustees who hold it in trust for the benefit of the stockholders of the bank.

The action is a representative one. The bank and the company, while nominally defendants, are in reality plaintiffs. Recovery, if any, does not belong to the individual plaintiff stockholders, but belongs to and must be paid over to the bank itself or the company.

This is not a case such as many of those cited in the plaintiffs' briefs in which a board of directors by breach of duty has brought a bank into insolvency. The bank is a going and solvent institution with over $1,000,000,000 in deposits — an increase of $124,362,651.30 between January 1, 1934, and April 30, 1934.

Plaintiffs in this consolidated action charge that the directors breached their statutory or common-law duty in certain claimed respects, to the damage of the bank and the company. The alleged breaches may be grouped under the following main headings:

I. Loans of $2,400,000 to officers and employees. II. Purchase by the company of 71,000 shares of bank stock on October 28, 1929. III. Sugar loans and investments. IV. Alleged unauthorized profits in Boeing and United Air Craft stock. V. Alleged unauthorized loan of $75,000 to defendant Baker. VI. Management of funds of the bank and the company.

Before taking up each of these main headings, I will first discuss the statutory and common-law duties of directors and officers of national banks.

The duties and civil obligations of directors and officers of national banks are twofold: (1) Those imposed by the National Bank Act, the charter and by-laws of the bank; and (2) the common-law duties concurrently arising from the fiduciary relationship to stockholders, depositors and creditors.

(1) Statutory duty. To justify recovery for violation of statutory duty in effect an intentional violation must be shown. (*Yates* v. *Jones National Bank*, 206 U. S. 158; 27 S. Ct. 638; 51 L. Ed. 1002; *Thomas* v. *Taylor*, 224 U. S. 73, 82; 32 S. Ct. 403; 56 L. Ed. 673; *Bowerman* v. *Hamner*, 250 U. S. 504, 513; 39 S. Ct. 549; 63 L. Ed. 1113; *Gamble* v. *Brown*, 29 F. [2d] 366 [C. C. A., 4th, 1928].)

Section 93 of National Bank Act lays down the rule and provides the test for personal liability of directors: " § 93. Violation of provisions of chapter; * * * personal liability of directors. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. * * * And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation. (R. S. § 5239.) " (U. S. Code, tit. 12, § 93.)

A director who does not actively or passively participate in the unlawful acts or omissions of his codirectors is not responsible. (*Warner* v. *Penoyer*, 91 Fed. 587; 33 C. C. A. 222.)

The damages recoverable are not penal but remedial, and represent indemnification to the bank for established loss, and such loss must fairly be shown to be the proximate result of an established breach of duty of the director charged. The director's statutory liability may be either joint or several, and the absence of improper motive or of any desire for personal profit is no defense to a director charged with statutory violation. (*Corsicana Nat'l Bank* v. *Johnson*, 251 U. S. 68, 83; 40 S. Ct. 82; 64 L. Ed. 141; *Ringeon* v. *Albinson*, [D. C.] 35 F. [2d] 753.)

In *Yates* v. *Jones National Bank* (*supra*, at pp. 177, 178 of 206 U. S., 27 S. Ct. 638, 644) the court stated: "As the section [U. S. Code, tit. 12, § 93, National Bank Act] thus comprehends all the express commands to do or not to do, as to directors, contained in the national bank act, and besides specifies the nature of the conduct of directors from which their *civil liability* for violation of such commands may arise, it results that liability cannot be entailed upon them by exacting a different and higher standard of conduct as regards such commands than that established by the statute without depriving directors of an immunity conferred upon them. That the words ' shall knowingly violate, or knowingly permit,' etc., found in the first sentence of section 5239, Rev. Stat. [U. S. Code, tit. 12, § 93, National Bank Act], were intended to express the rule of conduct which the statute established as a prerequisite to the liability of directors for a violation of the express provisions of the Title relating to national banks, is additionally shown by the oath which a director is required to take, wherein, as already stated, he swears ' that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly

violate, or willingly permit to be violated, any of the provisions of this Title.' Mark the contrast between the general common law duty to ' diligently and honestly administer the affairs of the association ' and the distinct emphasis embodied in the promise not to ' knowingly violate, or willingly permit to be violated, any of the provisions of this Title.' In other words, as the statute does not relieve the directors from the common law duty to be honest and diligent, the oath exacted responds to such requirements. But as, on the other hand, the statute imposes certain express duties and makes a knowing violation of such commands the test of civil liability, the oath in this regard also conforms to the requirements of the statute by the promise not to ' knowingly violate, or willingly permit to be violated, any of the provisions of this Title.' "

(2) Common-law duty. The measure of duty and the degree of care required of national bank directors in the performance of their common-law obligation is that which ordinarily prudent and diligent men would exercise under the same or similar circumstances, and, in determining that, the restrictions of the statute and the usage of national banking business must be taken into account. The question of negligence is ultimately one of fact to be determined under all the circumstances in each particular case. The directors' common-law liability may be either joint or several, depending upon the circumstances and the character of the negligence, whether by them as individuals or as a board, and the loss claimed must be established as proximately resulting from the act or failure of the director charged. (1 Michie Banks & Banking, § 34, p. 135; *Briggs* v. *Spaulding,* 141 U. S. 132, 152 [1891]; 11 S. Ct. 924, 931; 35 L. Ed. 662; *Ringeon* v. *Albinson,* [D. C.] 35 F. [2d] 753, 754; *First National Bank of Fairbanks* v. *Noyes,* [C. C. A. 1919] 257 Fed. 593; *Cory Mann George Corp.* v. *Old,* [C. C. A. 1928] 23 F. [2d] 803, 807, 808; *McRoberts* v. *Spaulding,* [D. C. 1929] 32 id. 315; *Burckhardt* v. *Northwestern Nat. Bank,* [C. C. A. 1930] 38 id. 568; *Rankin* v. *Cooper,* [C. C. A. 1907] 149 Fed. 1010, 1013.)

In the leading case of *Briggs* v. *Spaulding (supra),* after stating that the defendants, certain bank directors, are not strictly trustees but are held to a fiduciary duty, the court, by Chief Justice FULLER, ruled as follows: " In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is, therefore, ultimately a question of fact, to be determined under all the circumstances."

In *Rankin* v. *Cooper* ([C. C. A. 1907] 149 Fed. 1010, 1013) a clear summary of the relationship of directors to national banks is made: " (1) Directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its affairs. (2) They are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors. (3) Ordinary care, in this matter as in other departments of the law, means that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. (4) The degree of care required further depends upon the subject to which it is to be applied, and each case must be determined in view of all the circumstances. (5) If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, upon the other hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. (6) Directors are not expected to watch the routine of every day's business, but they ought to have a general knowledge of the manner in which the bank's business is conducted, and upon what securities its larger lines of credit are given, and generally to know of and give direction to the important and general affairs of the bank. (7) It is incumbent upon bank directors in the exercise of ordinary prudence, and as a part of their duty of general supervision, to cause an examination of the condition and resources of the bank to be made with reasonable frequency."

The duties of directors under the New York State authorities are in accord with the Federal decisions (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185; *Continental Securities Co.* v. *Belmont*, 206 id. 7; *Pollitz* v. *Wabash R. R. Co.*, 207 id. 113), and the same common-law rules apply to the directors of the company as to the bank.

In all actions against directors of a national bank to charge them with personal liability the ultimate burden of proof is upon plaintiffs to prove not only the loss, but the breach of duty on the part of the directors. (1 Michie Banks & Banking, § 122, p. 201; § 199, p. 273, and cases cited.)

Before referring to the defenses of the statutes of limitation that have been pleaded the court will consider on the merits the alleged breaches, classified under the above-mentioned main headings.

I. Loans to officers. Plaintiffs contend that the loans to officers and employees of the bank and the company originally authorized by the bank's executive committee, on November 13, 1929 (Plaintiff Exhibit 12), were improvident, unjustified and illegal, and that the directors making or approving them are personally liable for all resulting damages. If it were the fact, as plaintiffs contend, that the directors made these loans to keep up the price of the bank's stock by preventing officers and employees who had become overextended from throwing it on the market, or to enable officers and employees to continue speculation in bank and other stocks, such action should receive the severest denunciation of the court, and directors authorizing or consenting thereto undoubtedly should be held personally liable for losses arising from such gross dereliction of fiduciary duty. But the testimony in this record is overwhelming in establishing that these loans were not made for the above-claimed improper purposes, but because the directors in November, 1929, after the alarming reports they had received from the executive officers on whom they had every right to rely, concluded in good faith and in the exercise of their best judgment at the time that the loans were imperative for the continued efficiency of the bank's personnel and even for the safety of the institution itself, to help avert possible disaster in a most grave emergency and during a time of unparalleled strain and widespread financial panic. Plaintiffs' contentions are not only refuted by the preponderance of the testimony, but on the facts must be unfounded, as all the borrowers put together held only 14,000 out of 6,200,000 shares issued and outstanding, i. e., about two-tenths of one per cent; and of these only 3,300 shares, or one-sixteenth of one per cent, ever came as collateral into the hands of the trustees who made the loans. (See Exhibits 19, 25–30, 34, 36–38, 40, 43, 68 and 177.)

I have reached these conclusions after a careful examination of all the testimony and the exhibits.

These directors assumed a grave responsibility in making these loans; but, under the circumstances they then faced, to do otherwise might, in their judgment at the time, have entailed a much more serious responsibility, involving, as I believe they then thought, even danger to the institution itself. Clearly, they were not making the loans to obtain any financial assistance for themselves; the record shows that not a dollar of the $2,400,000 loaned was advanced to any of the directors or officer directors who authorized the loans.

The directors also acted under the advice of competent counsel who before the resolution was passed properly advised them that under the law (as it *then* existed) there was no prohibition of such loans in the National Bank Act and never had been. In this connection it is important to observe it was not until 1933 that for the first time, under the National Bank Act, it was made unlawful for any executive officer of a bank to borrow from his own bank (§ 12, Bank Act of 1933, amending Federal Reserve Act, § 22, subd. g [U. S. Code, tit. 12, § 375-a]); and this new section provides that loans already made by member banks to executive officers may be renewed for two years " if in accord with sound banking practice." The Bank Act, therefore, expressly recognizes that prior to this 1933 enactment, loans to officers were not illegal and permits such prior loans to be renewed.

Plaintiffs also attack the trust created to make the loans, claiming that no real trust existed, but that the trustees were mere agents of the bank. In view of the conclusion that the court reaches on the merits regarding the alleged breach of duty in making the loans, this contention is not of vital import, but I deem it proper to pass upon the objection that has been urged and I rule that the plaintiffs' contention is unfounded and conclude that Perkins and Swenson were, in fact, trustees and not mere agents of the bank in making the loans in question.

Plaintiffs also claim that section 83 of the National Bank Act (U. S. Code, tit. 12, § 83), providing that no national bank shall make any loan or discount on the security of its own stock, was violated, to the damage of the bank and its stockholders. The original resolution authorizing the loans on November 19, 1929, said nothing whatever of bank stock as collateral or otherwise, but expressly authorized the trustees " to make loans or advances with or without security." (Plaintiffs' Exhibit 12.) The shares of bank stock later taken over by the trustees as collateral were so taken only as an incident to taking over loans theretofore made to the borrowers by some other person. (Plaintiffs' Exhibit 68.) Plaintiffs' cases refer to loans in excess of the statutory limit of ten per cent, and are, therefore, not in point; for such loans the directors are absolutely liable and the peril to be avoided is a direct injury to the stockholders. (*Corsicana Nat'l Bank* v. *Johnson*, 251 U. S. 68, 85, 86; 40 S. Ct. 82; 64 L. Ed. 141.) There is no claim here of exceeding the ten per cent statutory limit. Indeed, the entire amount loaned was only ten per cent of the bank's 1929 payroll. The object and policy of section 83 is to prevent the reduction of the outstanding stock of national banks and the withdrawal *pro tanto* of its capital. (*Wallace* v. *Hood*, [C. C.] 89 Fed. 11; affd., *Hood* v.

*Wallace,* 97 id. 983; 38 C. C. A. 692; affd., 182 U. S. 555; 21 S. Ct. 885; 45 L. Ed. 1227.) In *National Bank of Xenia* v. *Stewart* (107 U. S. 676, 677; 2 S. Ct. 778, 779; 27 L. Ed. 592) Mr. Justice FIELD, discussing section 5201 of the Revised Statutes (now U. S. Code, tit. 12, § 83), said: " While this section in terms prohibits a banking association from making a loan upon the security of shares of its own stock, it imposes no penalty, either upon the bank or borrower, if a loan upon such security be made. If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank." (See, also, cases cited, Pratt's Digest of Federal Banking Laws [1933 ed.], p. 28.)

Finally, even assuming a breach of the statute, the ultimate test for the directors' personal liability is section 93 (*supra*), viz.: "All damages which the association * * * shall have sustained in consequence of such violation." (U. S. Code, tit. 12, § 93.) By the act of the trustees in taking this bank stock as an incident to taking over the loans from other persons, no damage whatever has been shown to the bank or its stockholders.

I limit the ruling on these loans to the facts established in this record, and on the whole question of the loans attacked I conclude that the board of directors at the time the loans were made had power to make them to employees and officials, that they made them in the exercise of their fair and honest judgment at the time for the purpose of preserving the security and integrity of the institution, and that they considered the financial and moral responsibility of the borrowers and their several importance to the bank's organization. The loans having been so made, a court of equity will not hold the directors personally liable, even if some of the loans prove to be uncollectible, though every reasonable effort should be made by the company which has taken over the balance of the unpaid loans to amortize them before they are outlawed by the Statute of Limitations. The directors of a national bank cannot be held personally responsible for losses on loans made by them in good faith and, as they thought, for the best interests of the bank, merely because such loans appear to have been unwise and hazardous when viewed in retrospect. The question of improvident loans depends upon what the directors fairly and reasonably thought *in making the loans* and the method and motive controlling their action. (7 Michie Banks & Banking, § 132 B, pp. 133, 134, and cases cited.)

I cannot, however, dispose of this aspect of the case without pointing out that one of the competent producing causes for the emergency that made these loans necessary was the very existence and opera-

tions of the so-called affiliate, the National City Company. The express purpose of this corporation was to sell, to purchase, to float and underwrite securities, and that included the stock of the bank. When this very affiliate was organized in 1911, the then Solicitor General of the United States, Frederick W. Lehman, vigorously condemned, on principle, the affiliation of a securities company with a national bank. His opinion (Plaintiff's Exhibit 184) was addressed to the Attorney-General of the United States, and states at the outset that the opinion was submitted because the President desired a fuller discussion of the question of the legality of the agreements and arrangements between the National City Bank of New York and the National City Company. No proceeding was, however, taken against the bank to charge it with any violation of law in the organization and operation of the company.

It is common knowledge that since that time numerous similar affiliates have been organized and operated in connection with national and other banks and trust companies throughout the nation.

For many years prior to the formation of these affiliates the underwriting and the sale of securities were handled by investment houses or private banks. National banks were not permitted to deal in securities or to underwrite and distribute new issues. But, as the Solicitor General pointed out in his almost prophetic opinion, the existence, organization and recognition of the affiliates enabled the banks legally to do, through their affiliates, what the banks themselves could not do.

Not until the act of June 16, 1933, was it provided (§ 20, entirely new [U. S. Code, tit. 12, § 377]) that no member bank under the National Bank Act shall after June 16, 1934, be affiliated with any corporation or other organization which is " engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail   *   *   *   of stocks, bonds, debentures, notes or other securities." By another new section amending the Federal Reserve Act (section 23A [U. S. Code, tit. 12, § 371-c]) an express limitation is provided in the aggregate of loans by a member bank to an affiliate. By section 19 of the act of 1933 (U. S. Code, tit. 12, § 61), section 5144 of the Revised Statutes was amended to provide for cumulative voting of national bank stock and requires holding company affiliates to obtain a voting permit from the Federal Reserve Board before they can vote stock of national banks held by them, and further provides as a condition for the obtaining such permits, an agreement to *be examined* by bank examiners and to build up certain marketable assets other than bank stock and divest themselves of any security affiliate which *they* may be interested in. Section 21 of the 1933 act (U. S. Code, tit. 12, § 378, also entirely new)

makes it unlawful for any corporation engaged in the business of issuing and underwriting and distributing securities to receive deposits.

These entirely new sections of the National Bank Act evince for the first time a declaration of public policy by statutory enactment to divorce national banks from their security affiliates, and at least to begin the separation of commercial banking as such from investment banking as such. The new requirement of the separation of national banks from their security affiliates, and the separation of commercial banking from investment banking, are now declared to be public policy by the National Bank Act. It is regrettable that this sound and fundamental principle of banking is enacted in the statute only after the events have conclusively shown the unwisdom of the prior practice. The new legislation recognizes that banks of deposit, commercial banks, the normal depositories for the liquid funds of business men and the general public, should not, directly or indirectly, be interested financially in any affiliate the main source of whose income consists of profits made from the sale of securities, and especially such securities as the bank's own shares in which the bank and its shareholders are vitally interested financially. That interest, however established, necessarily would involve sooner or later, in some way or other, the violation of the principle that no man or institution can serve two masters.

Undoubtedly the loans here attacked were made in 1929 because the directors were convinced that they were necessary to maintain the efficiency and morale of the officers and employees who were overextended in bank shares. But it is equally certain that these persons were thus overextended because of the existence and the operation and the highly efficient salesmanship of the security affiliate. The court, however, takes judicial notice of the fact that for upwards of twenty years everybody, from the Department of Justice down, well knew that numerous commercial banks, member banks under the National Bank Act, had security affiliates and that the control of such affiliates was held by the same persons who controlled the affiliated national bank, the arrangement in most cases being similar to that in the instant case, where each stockholder of the bank was *pro tanto* a beneficiary under a trust agreement by which the stock of the affiliate was held. Hence, for nearly a quarter of a century there had grown up a practice by which national banks, which were not permitted under the National Banking Act to purchase their own stock or to underwrite or make flotations of securities, were permitted to do these things through their affiliate, which was, in truth, the *alter ego* of the bank.

This and the inevitable use of the affiliate to sell more and more widely the stock of the affiliated bank was a substantial factor in

bringing about the overextension in bank stock by the officers and employees, imperiling their efficiency in a period of great financial strain and crisis. But neither the existence of the affiliate, nor the sales of securities by it, known and approved by widespread commercial usage and custom from the establishment of this affiliate down to 1929, was until the act of 1933 illegal or *ultra vires*. Nor on this record can such facts at this late date be made the basis of personal liability against these directors.

II. Purchase of 71,000 shares October 28, 1929. Plaintiffs contend that the purchase of 71,000 shares of bank stock by the company acting through the defendant Baker on October 28, 1929, for the purpose of supporting the market in the stock, was illegal; that it was induced by the obligation assumed by the company in connection with the then proposed Corn Exchange merger to pay $360 for each share of Corn Exchange stock to stockholders of said bank, on demand, if offered for purchase within twenty days after the proposed merger; and that the purchase was a wasteful expenditure of the company's money, which did not profit by the transaction and resulted in substantial losses, which the plaintiffs estimate at $1,497,873.12.

The test for liability on this claim is: Should the directors in the exercise of ordinary care and prudence, in view of all the then existing and known facts and circumstances (including market conditions at the time of the merger agreement, prior tradings, etc.), should they, in the light of these and other relevant facts, have on October 1, 1929, reasonably anticipated what was likely to happen in the latter part of October, 1929, and have then or later placed definite limitations on the amount of bank stock that Baker could buy in any one day?

To answer this question one has only to recall conditions and general opinion in September and the early weeks of October, 1929, or, if one's memory is short, to refresh one's recollection by a perusal of the New York Times Index for October and November and December, 1929. (New York Times Index, October, November, December, 1929, vol. 17.) It is undisputed that none of the directors knew of the particular purchase complained of on October 28 until after the event. On analysis, plaintiffs' contention must be that the directors, in the exercise of ordinary care, should have foreseen the fact that the market was likely to crash on October twenty-eighth, that such calamitous fall in all securities was to be followed by a series of precipitous and disastrous declines, initiating a long depression from which the country is still suffering in 1934; and that they should have known that Baker was going to make this concededly grievous error of judgment on that day.

There was nothing illegal or *ultra vires* involved in the company's purchase of stock, or in its agreement to purchase Corn Exchange Bank stock at $360 for a short period of time, if the purchase and the agreement be viewed not in the light of after-acquired wisdom, but in the light of conditions and general belief on October 1, 1929. I am convinced that all of the directors, at the time the agreement of merger was made (October 1, 1929) were firmly convinced that the proposed merger was for the highest interests of both the bank and the company; and it is a fair inference that, if the shareholders were then canvassed, they would have unanimously concurred. The directors who sanctioned the proposed merger were themselves, and their families, vitally interested as bank shareholders in the success of the merger plan.

Plaintiffs' argument that the purchase was illegal because made in part to maintain the market price cannot be sustained. Plaintiffs' cases on " rigging " the market are not in point. In this case the company was purchasing the stock in open market from *bona fide* sellers. The belief was general that the drastic declines on October twenty-fourth were temporary and unjustified. (New York Times Index, vol. 17, *supra*.)

There is no proof that the purchase involved any fraud. It was made in the exercise of the best judgment of defendant Baker at the time, at prices he believed then to reflect the fair value of the bank stock.

Plaintiffs' argument that the company did not benefit is untenable in view of the fact that the proposed merger, if it had been consumated, furnished enormously increased facilities for the company in its main business.

The purchase complained of was made a possibility by the very existence of the affiliate and its relations to the bank, none of which at that time were *ultra vires*, illegal or unlawful. This record establishes conclusively that the directors on October 1, 1929, were convinced that the merger (which was never ratified because the day of ratification had been fixed for November 7, 1929) was a sensible and wise one; that bank stock would not fall to $450 or anything like it; that the expansion which up to October 1, 1929, had been going forward for a number of years in apparent undiminished strength would continue; and that when the merger was ratified the market value of bank stock would be greatly enhanced. That conviction unquestionably was shared by the stockholders. They were wrong. The date for the ratification had (all unknowingly) been set to occur after the greatest single catastrophe, financial and commercial, that the world has ever known — the worst fall in values not merely of bank stock but of all securities in the New York and

all the markets of the world. Everybody now can see, in the illuming light of over four years' experience of widespread economic depression, that the purchase of that number of shares on that day was a major error of business judgment. But such error is not the basis of predicating personal legal liability against the defendants. Again, the competent producing cause of the danger was the very existence and operation of the affiliate and its relations with the bank.

III. Sugar loans and investments. Plaintiffs contend that from 1923 the bank, under the pretense of a salvage operation, was illegally engaged in the Cuban sugar business, a business inconsistent with the conduct and operation of a national bank and prohibited by the National Bank Act; that the bank could have disposed of the properties at a relatively small loss in 1924; and that the transactions after 1923, or certainly 1924, were *ultra vires* and resulted in large losses. The true test of liability under this aspect of the case is: Was the salvage operation a pretense and could the bank have disposed of the property under such circumstances that the failure so to do makes the directors personally answerable for all losses subsequently entailed?

Plaintiffs do not question the propriety of the original loans or transactions, at least up to 1923, but contend that they then, or in 1924, became *ultra vires* and, in any event, that the alleged offer of the American Sugar Refining Company in 1924 of $4,500,000 should have been accepted.

In 1923 the bank had outstanding in Cuba a total of $66,000,000 in loans, roughly divided as follows: (a) Loans to merchants connected with the Cuban sugar industry, $24,666,000; (b) " Head office loans " to sugar farmers and operators (not taken into General Sugar group), $16,568,000; (c) Plantation loans (ultimately going into the General Sugar group), $25,743,000.

To reach anything like a just and sensible result on this important sector of the case requires some knowledge of the salient aspects of the Cuban sugar market and, indeed, the world markets in sugar during the periods in question. The record is replete with such information, and the court may also take judicial notice of the various tariff acts of the United States and other relevant statutory enactments.

By two tariff acts, the act of May 27, 1921 (U. S. Code, tit. 19, § 160 *et seq.*), and September 21, 1922 (42 U. S. Stat. at Large, 858), the landed duty on Cuban raw sugar was increased, first to sixty per cent and then to seventy per cent above the rate previously provided by the act of 1913 (38 U. S. Stat. at Large, 114). During the war the Federal Food Administration fixed the price of sugar

and also regulated its distribution, and it is a matter of common knowledge that there were a series of sugar famines. When government control terminated in 1919 there occurred an unparalleled rise in the price of Cuban sugar. In May, 1920, the price of Cuban raw sugar reached the unprecedentedly high level of twenty-two and five-tenths cents a pound. This swift and extraordinary rise was followed by a fall equally precipitous. In six months Cuban sugar had fallen to three and six-tenths cents per pound. The decline continued through 1920 and 1921 when it fell to one and eighty-one one-hundredths cents a pound. In 1922 it rose and much more rapidly in 1923. At that time the bank had outstanding the above-mentioned loans.

After this collapse in the Cuban sugar market the directors were faced with the problem of how to salvage loans aggregating $66,000,000 that had been made prior to the collapse. The testimony in the record is indisputable that if the companies in the sc-called General Sugar group had not been organized, the loss on plantation loans (then over $25,000,000) would have been almost total, and, if the cane had been permitted to go uncut for a few years, the loss on the acreage involved would have been between $7,000,000 and $9,000,000. Of the head office loans to sugar farmers and operators, including plantation loans (b and c, supra) totaling over $42,000,000, an immediate liquidation at that time would have meant almost total loss. Of the loans to merchants (a, supra) the salvage operation collected $17,800,000. Of the head office loans $10,786,000 was collected. Obviously the salvage efforts were important in these collections; the mere fact that the mills operated enabled merchants to make payments that would otherwise have been impossible.

Plaintiffs lose sight of the fact that the salvage which they approve up to 1923 was not and could not have been completed then. Later on, and as part of the effort to save the loans, the bank was compelled to take over as collateral the shares of the Camaguey and Santa Clara companies which were held for a short time (Defendants' Exhibit AA.) The bank's interest in the securities companies that were later organized was incidental to the continuous effort to get out whole, or as nearly whole as possible, on Cuban loans and the bank remained a creditor.

The final test here is one of fact, not of law: Was the salvage operation, though incidentally involving acts of management or improvement, in fact carried on in good faith to render the properties valuable to secure liquidation of the debts? Or was it in fact a mere cover to enable the bank to engage in a business for ulterior purpose? (*Bailey* v. *Babcock*, [D. C.] 241 Fed. 501; *Merchants'*

*National Bank* v. *Wehrmann,* 202 U. S. 295; 26 S. Ct. 613; 50 L. Ed. 1036; *First National Bank* v. *National Exchange Bank,* 92 U. S. 122; 23 L. Ed. 679; *Roebling* v. *First National Bank,* [D. C.] 30 Fed. 744; *Reynolds* v. *Simpson & Ledbetter,* 74 Ga. 454; *Cooper* v. *Hill,* [C. C. A.] 94 Fed. 582; *Emigh* v. *Earling,* 134 Wis. 565; 115 N. W. 128; Id., affd., *sub nom. Rankin* v. *Emigh,* 218 U. S. 27; 30 S. Ct. 672; 54 L. Ed. 915; see, also, note 27 L. R. A. [N. S.] p. 243 *et seq.*)

On all the evidence, plaintiffs have failed to sustain the charge that the salvage operation was a mere cloak for engaging in business. On the contrary, the overwhelming preponderance of the testimony shows that the salvage operation was initiated and conducted in the exercise of the best judgment of the directors at the time in an effort to save the then outstanding enormous loans that would otherwise have been almost a total loss. The sugar properties were carried because the directors were convinced that the bank and its stock-holders would lose more by walking away from Cuban sugar loans than by attempting to save them. If the loans aggregating $66,000,000 were not, as plaintiffs must concede, *ultra vires* or illegal or made in fraud or dereliction of duty before 1923, such loans clearly did not become so in 1923 or 1924.

The total of the General Sugar group loans of $25,743,511.84 and of the head office loans of $42,312,160.70 originated between 1919 and 1920 as short-term loans, but by the end of 1921, due to inability to pay following the Cuban sugar collapse of 1920, they began to be long-term loans with properties rather than commodities as security. The court can take judicial notice of the widespread practice increasing in the decade between 1921 and 1931 of commercial banks in the United States making long-term loans or loans that by reason of the nature of the business involved might become long-term loans, and also of the equally increasing practice of such commercial banks in the United States in making loans in increasing amounts secured by collateral. In 1933 the report of the Economic Policy Commission of the American Bankers' Association contains the following figures: " On June 30, 1931, national banks had loans, discounts and investments totalling $20,600,000,000 and of this total only $6,800,000,000 was in the form of strictly commercial banking credit, while $4,540,000,000 was in loans collateralled by stocks and bonds, and $7,670,000,000 in investments in securities. That is, $12,210,000,000, or almost 60 per cent of their credit structure, involved security investment * * * trust companies * * * had aggregate loans and investments of $12,350,000,000 of which $3,110,000,000 were commercial credits, $3,390,000,000 loans secured by stocks and bonds and $4,590,000,000 in direct invest-

ments.  This means that $7,980,000,000, or over 64 per cent of their credit structure, involved investments." Strictly commercial loans had fallen steadily in that same ten-year period.

Not until the Bank Act of 1933 do we find a separation directed by statute between strictly commercial banking and investment banking as such.  All during the period that commercial banks were more and more being committed to loans that were in fact or in strong potency long-term loans, or capital investment secured by stock as collateral, the National Bank Act prohibited national banks from engaging in business, but it apparently was not foreseen that to permit commercial banks to make long-term or collateral loans in such quantities would sooner or later in any widespread emergency necessarily oblige them to take over the mortgaged or pledged property and engage for considerable periods in such activities as were reasonably necessary to save the loans.  During the past four years that result has been all too painfully obvious.  To have made such loans, or fallen in with the then common, though excessive, trend of American commercial banking practice cannot at this late date be made the basis of personal liability against the directors. The court in respect to the sugar loans upon this record holds the directors are without liability.

I also hold that the " offer " of the American Sugar Refining Company in 1924 was not a formal firm offer, and its refusal by the directors was not a breach of any statutory or common-law duty. If the offer had been accepted, it would have left the bank with some $18,000,000 of outstanding current loans which the American Sugar Refining Company refused to assume (Plaintiffs' Exhibit 91), and would also have required a guaranty by the bank to the refining company of the collectibility of all outstanding Colono loans amounting to $2,270,830.03.  (Plaintiffs' Exhibits 172A, 173A, 95, and 96.) Its acceptance not only involved a direct and immediate loss of $8,000,000, even assuming that the offer of $4,500,000 was a firm offer, but also left the bank involved with large loans on the Santa Clara development, which without the other companies would have involved still greater loss.

The directors began the salvage operation, but, due to the unique and extraordinary vicissitudes of Cuba and the Cuba sugar market since then, to the American tariff regulations, the enactments of the Cuban government itself, and world-wide conditions in the sugar market, they have been unable up to now to dispose of the properties or interests, or collect the loans in full.

In addition to the recoveries of over $10,000,000 on head office loans and over $16,000,000 on Cuban merchants' loans, the properties in the General Sugar group between 1922 and 1927 paid

interest to the bank on their indebtedness in the total sum of $3,764,000. From 1927 to date those same properties paid additional interest on their indebtedness to the bank in the total of $8,217,000. During the period 1922 to 1932 net profits of the Cuban branches of the bank were approximately $10,000,000.

The loans were increased from 1927 to December, 1932, a part of the increase, $2,660,000, being explained by the forced acceptance by mandate of local laws of Cuban government stabilization bonds in lieu of cash in liquidation of loans on pledged sugar. From September, 1933, to March, 1934, the indebtedness of the General Sugar group to the bank has been decreased about $2,000,000 (Defendant's Exhibit X), and the General Sugar group at the present time is earning operating profits and for the past year has required no advances.

The Jones-Costigan Bill, passed in May, 1934, providing for sugar quotas for Cuba, and the reduction of the Cuban sugar tariff, also made in May, 1934, indicate that the government at Washington has realized that some relief should be given to Cuba. Every effort should be made to amortize these loans or restore them to a current basis, both as to term of loans and collateral.

IV. Alleged unauthorized profits in Boeing and United Aircraft stock. The complaint alleges (article 52) that many of the defendants made secret profits upon dealings in securities of various named concerns, nineteen in number. But to sustain this charge evidence was offered only on one transaction, namely, the Boeing Airplane and Transportation Company, the name of which was later changed to the United Aircraft Company. Neither the bank nor the company suffered any loss on these transactions. On the contrary, the company made a substantial profit, and it appears that individuals who bought the blocks of the stock in question have since suffered substantial losses. (Plaintiffs' Exhibits 202 and 203.) The result of the whole transaction in the sale to the individuals in question was an actual cash profit to the company of $245,370.67. (Plaintiffs' Exhibit 169.) There is no proof that the company could have realized a larger profit and there is no evidence on which to hold a single director or officer personally liable. The company sold the securities in the only manner in which they could have been sold, at a safe, certain and secure profit, and on these and other sales of these particular securities the total aggregate cash profit on the transactions to the company was $375,370.67. Plaintiffs' claim on these facts is without merit.

V. The Stock Purchase Plan Corporation $75,000 item. On December 1, 1931, the board of directors of the Stock Purchase Plan Corporation, which had been organized for the purpose of

arranging subscription to bank stock on the part of employees and officers, authorized the purchase of 1,500 shares of bank stock and the sale of the same to the defendant Baker at $50 per share, the then market value, the defendant Baker to repay the $75,000 involved in monthly installments of $1,500. A contract for the said 1,500 shares was signed by Baker and the treasurer of the Stock Purchase Plan Corporation on a form that apparently was used, as its heading indicates, in arranging for subscriptions for bank stock; interest has been paid and about $5,000 on the principal and the balance is owed by Baker (Defendant's Exhibits OO and OO-1; Plaintiffs' Exhibit 218). In effect, the $75,000 transaction was to enable Baker to hold the 1,500 shares of bank stock which he wished to hold at the time but could not unless the Stock Purchase Plan Corporation took up the stock for him. Plaintiffs contend that this was not a transaction which the Stock Purchase Plan Corporation was organized and authorized to make, and that, therefore, the defendant directors of the company are liable. The transaction, however, was not by the defendants here sued as directors of the bank or company in their capacity as such directors or officers, but as directors of the Stock Purchase Plan Corporation, and, in any event, on the facts adduced before me, the transaction was not shown to be outside the purpose for which the Stock Purchase Plan Corporation was formed, namely, to assist officers and employees to subscribe to, purchase and hold shares of bank stock. Clearly, no breach of duty is established against the defendants, and plaintiffs' contentions on this point are overruled.

VI. Management funds. The management fund or incentive compensation plan of the bank was established in 1923; that of the company in 1921, by resolutions of the boards of directors, without, however, prior submission to the stockholders. The fund formula adopted by both boards was substantially as follows: After eight per cent had been set aside for the stockholders on invested and employed capital, one-fifth of the total remaining net profits in any one year was apportioned by periodical action of the boards among the executives responsible for the management, and the remaining four-fifths distributed to the shareholders.

Plaintiffs charge that the directors of both bank and company breached their common-law fiduciary duty in the establishment and operation of the funds and in the distribution of moneys thereunder, claiming that compensation of officers was increased exorbitantly and excessively, amounting to waste and spoliation of corporate assets. Plaintiffs also contend that there were certain improper eliminations of losses authorized by the boards in computing the management funds, and still other deductions that were wholly

unauthorized and arbitrary, resulting in alleged aggregate over-estimation in favor of managing officers of $1,830,075.36. Plaintiffs claim that the directors are personally liable for this sum, as well as for all other allegedly excessive, improper and improvident payment out of management funds.

Before passing on payments alleged to be excessive I must first rule on two items that plaintiffs claim are not merely excessive but void or voidable in their entirety, viz., (1) the payment on July 1, 1929, from the company's 1929 management fund; and (2) the payment on January 2, 1931, of an undistributed balance of the company's 1928 management fund.

(1) July 1, 1929, payment. On July 1, 1929, the board of the company made a semi-annual distribution from the company's management fund of $1,860,000, of which Mr. Mitchell received $666,666.67. There had been similar semi-annual distributions from the company's management fund in each preceding year since its establishment in 1921. The sum distributed was part of a total fund, $2,739,000, that had accrued up to June thirtieth of that year. The balance of approximately $879,000,000 remained undistributed as a reserve in the event that the last six months of the year would fail to show similar profits. (Plaintiffs' Exhibit 141.) At the end of that year, after the collapse of all markets in October and November, it was found that there was, for the annual period, no management fund distributable. There was a substantial controversy as to whether or not the recipients of the mid-year distribution were entitled to retain it. As a compromise, the board of the company agreed to accept an obligation of the recipients to repay the amounts received out of future accruals to the management fund, and passed a resolution that the shares so received " be debited against each of such officers respectively on the books of this Company, to be repaid by each of them out of any distributive share of the management fund, which each of such officers may be entitled to receive in any year subsequent to the current year 1929." (Plaintiffs' Exhibit 139.) There have been no such accruals from subsequent operations in the management fund to this date. Except in the case of defendant Rentschler, who repaid in full the $100,000 that he had received, and the defendant Ripley, who, for special services that plaintiffs do not contest and that were concededly of the reasonable value of $150,000, had that sum credited as repayment for the same amount that he had received, there have been no other repayments.

In December, 1930, the minutes of the board of the company referred to the mid-year 1929 payment as " an advance payment on account of an expected credit in the management fund which had failed to develop." Each of the officers had signed a paper which

was lodged with the treasurer of the company, and acknowledged the receipt of a specific amount on July 1, 1929, " which represents an over payment to me of my share for the year 1929 in the management fund and which is to be repaid by me from future additions to the said management fund before I become entitled to any further payments therefrom."

Concededly, when the payment of July 1, 1929, was made the board, under the authority of the resolution and the settled practice of prior years, was not guilty of any breach of duty in making at that time *some* distribution under the fund, and no claim can be made that it did not act prudently in the very large reserve kept to take up any reasonably expected loss of profits in the last six months of that year. At the time the resolution of December, 1929, was passed, it was not generally known or believed that the market break of 1929 was the beginning of a long depression. From all their past experience in handling the company's management fund the directors had ground to believe that there would be future accruals, in fact, there were such accruals in the early months of 1930. I am convinced that in December, 1929, the directors, as well as the recipients, honestly believed that such future accruals would arise and furnish an amply sufficient method of repayment. The resolution under which the distribution had been made (Plaintiffs' Exhibit 127) provided that " full discretion is reserved to this Board  *  *  * to determine any and all questions arising thereunder," and it also provided that the executive committee might make distribution of the management fund " at the close of the current year or at any time or *from time to time during the year*." (Italics mine.) (Plaintiffs' Exhibit 127.) The directors were not liable for making some payment on July 1, 1929, the company having made enormous profits in the first six months of that year. It is, moreover, a matter of common knowledge that the Bureau of Internal Revenue of the United States Treasury Department, after full consideration, has ruled that these very payments of July 1, 1929, were final payments to the recipients, that there was no obligation to repay, and that the money received constituted income to the recipients for that year, on the basis of which it has assessed additional income taxes; and the United States district attorney for the Southern District of New York had one of the recipients indicted for his failure to make return of his share as personal income and pay taxes thereon for the year 1929.

On all the facts it is clear the directors were not guilty of any breach of duty in compromising, as they did, the disputed claim in December, 1929. They also acted on advice of counsel as to the possibility of legally enforcing collection of a debt that was deemed

to be at least doubtful, and settled the claim by taking the notes from the recipients providing for repayment from future management fund accruals which everybody at the time expected. Except, therefore, to the extent that the court may find the particular payments of July 1, 1929, excessive, defendants, either directors or recipients, cannot be held personally liable for these payments.

(2) January 2, 1931, payment. On December 30, 1930, the board of directors of the company made note of the fact that the distribution of the company's management fund for 1928 was incomplete and that they had remaining $140,938.98 which had never been distributed. The minutes, after making reference to the distribution of July 1, 1929, refer to the fact that there were no accruals in the company's management fund in 1930 and that the salaries of the company's officers had been established at a low figure. Reference was made to the relatively much larger income received through the management fund in 1929 and prior thereto and to the resulting " position of discomfort from which the officers now ask relief through distribution to them of the amount remaining undistributed from the management funds accumulations for the year 1928, to which they feel they are morally entitled under the resolutions of that year." Thereupon the board (Messrs. Mitchell, Baker and Rentschler not voting) adopted a resolution that the undistributed part of the 1928 management fund, amounting to $140,938.98, shall be distributed not later than January 2, 1931, to the officers eligible under the 1928 distribution. The resolution also stated that the payments made in July, 1929, " shall continue to be considered as advances " and that the amounts " so advanced will be continued as ' debts owing ' by the officers to whom such advances were made, payable only, however, from amounts which may be distributed to such officers from future accruals in the management fund account."

This claim is clearly not barred by any statute of limitations. At the time the distribution was made in 1931, the officer recipients thereof who had received the substantial payments out of the 1929 fund, which on an annual basis had never accrued, had not repaid any part of it to the company. In that state of facts I hold that the " position of discomfort " from which the officers asked relief was no reasonably sufficient ground for directors making this distribution. The resolution of December 30, 1930, was an abuse of discretion and duty. The company's directors who participated in or acquiesced therein will be held liable for the repayment of $140,938.98, with interest thereon from January 2, 1931. The several recipients, officer directors, who are defendants, will also be held severally liable for the amount each received, with interest from January 2, 1931.

I will now consider the main charge urged herein against the directors in relation to the management funds, viz., that the directors, to the damage of the institutions, breached their common-law fiduciary duties in the establishment and operation of the funds, especially in approving, voting and allowing compensation that is claimed to be so excessive as to be a misuse or waste of corporate assets.

Predetermined incentive compensation to corporate officers based on a share of profits in addition to salary has been an accepted and widespread practice both in the United States and Europe during the past twenty years or more. No question is raised in the books but that a corporate officer may be paid a percentage of profits (see numerous cases cited in L. R. A. 1915D, p. 638 *et seq.*), and that such compensation, contingent upon net earnings, is a cost of the enterprise and not a distribution of funds exclusively allocated to stockholders. Such plans, if fair and not oppressive, have received both judicial and economic approval. (41 Yale Law Journal, 1931, p. 109 *et seq.;* 42 id. 1932–33, p. 419 *et seq.;* 46 Harvard Law Review, March, 1933, p. 828 *et seq.;* 86 Central Law Journal, 1918, p. 208 *et seq.; Seitz* v. *Union Brass & Metal Mfg. Co.,* 152 Minn. 460; 189 N. W. 586.)

We have long since passed the stage in which stockholders, who merely invest capital and leave it wholly to management to make it fruitful, can make absolutely exclusive claim to all profits against those whose labor, skill, ability, judgment and effort have made profits available. The reward, however, must have reasonable relation to the value of the services for which it is given and must not be, in whole or in part, a misuse or waste of corporate funds, or a gift to a favored few, or a scheme to distribute profits under a mere *guise* of compensation, but in fact having no relation to services rendered. (*Rogers* v. *Hill,* 289 U. S. 582, 590; 53 S. Ct. 731; 77 L. Ed. 1385; *Godley* v. *Crandall & Godley Co.,* 212 N. Y. 121.) To come within the rule of reason the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporation earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances; nor should it be unfair to stockholders in unduly diminishing dividends properly payable. (*Heublein* v. *Wight,* [D. C.] 227 Fed. 667; *Berendt* v. *Bethlehem Steel Corp.,* 108 N. J. Eq. 148; 154 A. 321; *Shera* v. *Carbon Steel Co.,* [D. C.] 245 Fed. 589, 591; *Church* v. *Harnit* [C. C. A., 6th, 1929], 35 F. [2d] 499, 502; *Putnam* v. *Juvenile Shoe Corp.,* 307 Mo. 74; 269 S. W. 593; *Venner* v. *Borden Co.,* N. Y. Sup. Ct., decided Oct. 11, 1927; *Scott* v. *P. Lorillard Co.,* 108 N. J. Eq. 153; 154 A. 515 [1931].)

Plaintiffs' claim that the existence and operation of the management fund was not made known to the stockholders, but was concealed, cannot, as far as the bank is concerned, be sustained. The record also establishes that none of these directors, as such, participated in any share whatever of the management funds they created and distributed. In the bank, during the management fund years, the board averaged twenty-three members, of whom only one, Mitchell, was, as an executive officer, a recipient of management fund distribution in 1923 and 1924, and only three, Mitchell, Rentschler and Simonson, shared as officers from 1925 to 1929. The other members of the bank's board, a balance of about twenty persons, were personally financially disinterested in the compensation voted, and there is no claim even made that they ever received any part of it.

In the company the average number of directors was eight members, of whom, from 1921 to 1924, only one, Mitchell, shared in the management fund as an executive officer; from 1925 to 1928 only two; and from 1928 to 1930 three shared. The non-officer directors, the overwhelming majority on both boards, had no personal financial interest whatever in the funds they voted to establish or distribute, and never received a dollar of compensation from them, and, on the contrary, as stockholders of large blocks of stock, they personally lost *in dividends* proportionally for every dollar voted the managing officers.

Concededly the directors had the power, expressly granted by the by-laws, to fix salaries, and that includes all forms of compensation for services. The Supreme Court of the United States in the *Rogers Case (supra)* expressly held that compensation to an officer for his services constitutes a part of operating expenses deductible from earnings in order to ascertain net profits, and that it is immaterial whether such compensation " is a fixed salary or depends in whole or in part upon earnings."

However, even assuming the legality and propriety of the creation and establishment of the funds and the formula adopted for distribution thereunder, I hold that the Supreme Court of the United States, in *Rogers* v. *Hill* (289 U. S. 582; 53 S. Ct. 731; 77 L. Ed. 1385) has laid down the rule of law that must be applied to the facts in this record and that rule requires the court to make an inquiry to determine whether the payments attacked constituted misuse and waste of the corporate funds, and, if so, to what extent.

In the *Rogers* case a by-law was adopted in 1912 by almost unanimous vote of the shareholders of the American Tobacco Company, which provided in effect that, if the annual net profits exceeded a certain sum the treasurer should pay each year ten per cent of

such excess to the president and the five vice-presidents of the company (the managing officers) in certain fixed percentages, two and one-half per cent of such sum going to the president and the balance divided among the vice-presidents. Payments under such by-law were made each year thereafter until 1930, when one stockholder, the plaintiff in that case, attacked the by-law as invalid and claimed that, if valid, the amounts paid thereunder had become so unreasonably excessive as to be waste and require revision by the courts. The percentages fixed by the by-law had yielded to the president of the American Tobacco Company total compensation in 1929 of $447,870.30, and in 1930 of $842,507.72, in addition to a large salary and cash credits. The District Court granted the plaintiff a temporary injunction; the Circuit Court of Appeals reversed that determination, Judge Swan dissenting. (60 F. [2d] 109.) Thereafter the District Court vacated the injunction and dismissed the complaint; the plaintiff appealed and the Circuit Court of Appeals affirmed on its prior opinion. (62 F. [2d] 1079.) That determination was finally reviewed and reversed by the United States Supreme Court (289 U. S. 582, 591, 592; 53 S. Ct. 731, 735; 77 L. Ed. 1385), the court unanimously ruling as follows: " While the amounts produced by the application of the prescribed percentages give rise to no inference of actual or constructive fraud, the payments under the by-law have by reason of increase of profits become so large as to warrant investigation in equity in the interest of the company. Much weight is to be given to the action of the stockholders, and the by-law is supported by the presumption of regularity and continuity. But the rule prescribed by it cannot, against the protest of a shareholder, be used to justify payments of sums as salaries so large as in substance and effect to amount to spoliation or waste of corporate property. The dissenting opinion of Judge Swan indicates the applicable rule: ' If a bonus payment has no relation to the value of services for which it is given, it is in reality a gift in part and the majority stockholders have no power to give away corporate property against the protest of the minority.' ([C. C. A.] 60 F. [2d] 109, 113.) The facts alleged by plaintiff are sufficient to require that the district court, upon a consideration of all the relevant facts brought forward by the parties, determine whether and to what extent payments to the individual defendants under the by-law constitute misuse and waste of the money of the corporation."

The arguments capably urged in this case by defendants' able and distinguished counsel were fully presented and considered by the Supreme Court in the *Rogers* case. Defendants' counsel there pointed out that during the life of their compensation plan

the net earnings of the American Tobacco Company reached the stupendous sum of $356,000,000. In the present case during the entire period of the management funds the operating profits were also stupendous, viz., $204,831,298.93. The figures in the present case, at least for a few of the officers in the higher brackets, outdistance anything paid under the American Tobacco Company, Mr. Mitchell receiving an aggregate compensation from both funds in 1929 of $1,375,534.67, in 1928 of $1,417,149.72, and in 1927 of $1,156,230. Corporate powers are subject to equitable limitations. Here, as in the *Rogers* case, there was in the formula applied each year no definite limits set except by percentages on the amount of profits officers should receive. Under the doctrine enunciated by the Supreme Court the above figures and certain others paid to a few of the officers at the top in the bank and the company are so large that without holding, before complete investigation, that they give rise to any inference of actual or constructive fraud or other breach of duty, I rule that they do warrant a full investigation by this court of equity in the interest of the corporation and objecting stockholders to determine whether there was in fact a deliberate or actionably negligent waste of corporate assets and, if so, to what extent.

In determining whether there is a waste or spoliation of corporate property the same rules govern as in making any other test of alleged violation by directors of their common-law duty. The ruling in the *Rogers* case did not intend to set aside these perfectly well-settled rules of law; it merely directed an inquiry to determine if they had been breached, and, if so, to what extent in damages. The inquiry is not merely to substitute the court's discretion for the discretion of the directors, if that has been honestly and fairly exercised. (See 27 A. L. R. 300–310; 44 id. 570, 572, note, and numerous cases cited.) The rule is established that directors of a corporation acting as a body in good faith have a right to fix compensation of executive officers for services rendered to the corporation, and that ordinarily their decision as to the amount of compensation is final except where the circumstances show oppression, fraud, abuse, bad faith or other breach of trust. (*Wellington, Bull & Co., Inc.*, v. *Morris*, 132 Misc. 509; affd., without opinion, 226 App. Div. 868, First Dept.; *Seitz* v. *Union Brass & Metal Mfg. Co.*, 152 Minn. 460, 464; 189 N. W. 586, 587; also reported in 27 A. L. R. 293 [1922]; *Matthews* v. *Headley Chocolate Co.*, 130 Md. 523; 100 A. 645.) If clear oppression, bad faith or other breach of trust is shown, the courts will give redress and determine to what extent the compensation is excessive. But plaintiffs must bring the case within one of the exceptions that are in each case predicated on a breach of legal duty with consequent damage to the corporation.

In *Seitz* v. *Union Brass & Metal Mfg. Co.* (*supra*), as to when courts will intervene, the court said: " If the officers, acting as they do in a fiduciary capacity, fix exorbitant and unreasonable salaries so as to absorb earnings which should go in dividends or remain with the company as surplus, they are not exercising the fidelity which the law requires and a court of equity will give relief at the suit of a minority stockholder by compelling restoration. In determining whether salaries are excessive and unreasonable so that there should be a restoration courts proceed with some caution. An intolerable condition might result if the courts should too lightly undertake the fixing of salaries at the suit of dissatisfied stockholders. An issue as to the reasonable value of the services of officers is easily made. It is not intended that courts shall be called upon to make a yearly audit and adjust salaries. The dissenting stockholder should come into court with proof of wrongdoing or oppression and should have more than a claim based on mere differences of opinion upon the question whether equal services could have been procured for somewhat less."

The court cited with approval *Matthews* v. *Headley Chocolate Company* (130 Md. 523, 535; 100 A. 645, 650), which was a suit by a corporation to require its officers to account for excessive salaries: " The Court would not be authorized to substitute its judgment for theirs [directors] as to what are proper salaries, provided they acted in good faith within their powers, and the salaries fixed by them were not clearly excessive."

The present case is rendered difficult and unusual by reason of the circumstance, among others, that here the overwhelming majority of the directors were financially disinterested in the compensation voted. A relatively simple case is presented where the entire board, or an overwhelming majority, vote, as directors, compensation *to themselves* as officers, or worse, as a mere incident to their offices as directors. Such action is presumptively fraudulent and voidable at the instance of a minority stockholder, and the burden in such cases is on the directors to show that their acts were fair and reasonable. Such is the case of *Carr* v. *Kimball* (153 App. Div. 825; affd., 215 N. Y. 634). Such also was *Rogers* v. *Hill* (*supra*), and such were all the cases cited by Judge SWAN at the end of his opinion in the *Rogers* case in the Circuit Court of Appeals, as authority for his conclusion that under " such circumstances the courts do not and should not refuse to consider whether a bonus plan is fair or oppressive." (60 F. [2d] 109, at p. 114.) Such also was *Godley* v. *Crandall & Godley Co.* (153 App. Div. 697; modfd., 212 N. Y. 121), with the added fact, in itself fatal to defense, that the distribution was made on the basis of stock ownership and not on the basis of services rendered.

Such state of facts is not reflected in the instant case. But that does not mean to say that, if it be found as a fact that there were breaches of duty and the compensation voted in such breaches bore no relation to the services rendered, the directors, or some of them, may not be held personally liable. A full and complete examination, however, of all the transactions must be had before the court can judicially determine such issue. The issues are further complicated not merely by the allegations of excessive amounts voted by the boards of directors, but by claims of alleged improper eliminations authorized by the boards of certain losses in computing the management funds, and also of still other eliminations of losses that are claimed to have been wholly unauthorized, as a result of which the funds are, in plaintiffs' elaborate schedules, revised downward by $1,830,075.36. Plaintiffs' numerous revisions downward involve: (1) Alleged unauthorized eliminations or deductions from capital, surplus and undivided profits accounts in various years in making the eight per cent calculation; (2) charges in surplus accounts claimed to be disregarded in management fund computation, either without any authorization or with alleged improper authorization; (3) additional data relating to numerous items, involving the contested propriety of corporate accounting in connection with the computation of the management funds.

Plaintiffs also claim that these alleged errors in computation go to disprove the contention that the formula was fair and reasonable and that the stockholders got eight per cent on their capital first and then four dollars out of every five dollars that was paid out of profits thereafter, and claim, on the basis of revised computations, that the " actual " percentage of corporate surplus and profits was in many years much less than eight per cent. To determine the accuracy and validity, if any, of these claims, long and complicated accounts must be gone into. Such long, intricate and difficult examination involving complicated issues of corporate accounting cannot on this record be made by the court, in the first instance. The facts concerning the establishment and operation of the management funds, whether such funds were annually properly set up with or without improper deductions, and the question of the legal liability of directors, can only be ascertained and properly determined after a full presentation of all the facts before a referee, who shall take the testimony and report with his opinion to the court concerning all the issues involved in the management funds. The issues referred will not be limited to alleged erroneous computations, because the question of the claimed breaches of common-law duty resulting in excessive compensation cannot be separated from the claimed errors in computation. On

all the testimony in the record and additional testimony to be adduced, including testimony as to proper corporate accounting practices, the referee will report whether or not breaches of duty are established; whether or not any of the sums paid to the officers in the higher brackets of both the bank and the company, through such breaches of duty, if found, were excessive and a waste of corporate assets, and, if so, in what aggregate amounts by years; whether or not improper eliminations of losses were actually made, or the usual customary and proper accounting practice followed; also whether there is established any actionable negligence of directors in failing properly to supervise or examine the yearly provisions for the management funds to satisfy themselves with reasonable care and diligence that the computations were fair to stockholders, bank and company, as well as recipients, and also whether the proceedings were ratified by the stockholders.

Hon. Frank C. Laughlin, of No. 57 William street, New York, N. Y., is appointed referee to hear and report to the court with his opinion on the issues referred with all expeditious speed. The referee will inquire on the merits into all the issues raised by the pleadings and proof in connection with the management fund of the bank from its inception in 1923 and of the company from its inception in 1921. To have a complete record and thus avoid if possible any retrial with onerous expense to all parties, the court at this time will reserve decision on the various defenses of the Statutes of Limitation, and upon the coming in of the referee's report the court will then pass upon the said defenses and their application to all the various matters in issue.

Both sides will submit on notice within five days from the date hereof order of reference accordingly, and also findings of fact and conclusions of law in duplicate, on all the issues except those relating to the management funds and the Statutes of Limitation. Findings and conclusions on the issues referred and on the defenses of the Statutes of Limitation, and final judgment on all of the litigated issues, will be made by the court on the coming in of the referee's report.