Abram J. BERKWITZ, Plaintiff,

v.

George M. HUMPHREY, George H. Love, J. B. Morrow, G. W. Kratz, Augustus K. Oliver, Arthur R. Braun, Emory M. Ford, L. F. Rains, Alan M Scaife, Arthur B. Van Buskirk, William P. Witherow, George W. Wyckoff, R. L. Ireland, H. D. Campbell, T. I. Parkinson, The M. A. Hanna Company, Pittsburgh Consolidation Coal Company, Defendants.

Civ. No. 27386.

United States District Court.
N. D. Ohio, E. D.

May 12, 1958.
As Amended May 14, 1958.

Harrison, Spangenberg & Hull, Allan Hull and Richard J. Cusick, Jr., of counsel, Cleveland, Ohio, for plaintiff.

George H. P. Lacey, Squire, Sanders & Dempsey, Cleveland, Ohio, for Pittsburgh Consolidation Coal Co.

Luther Day, George Rudolph, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for M. A. Hanna Co.

Maurice F. Hanning, McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, for all individual defendants who have been served by process.

Earl F. Reed, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendants George M. Humphrey, R. L. Ireland, George H. Love.

McNAMEE, District Judge.

This is a shareholder's derivative action brought by plaintiff, a resident of Massachusetts, against the Pittsburgh Consolidation Coal Company, a Pennsylvania corporation, two of its directors and The M. A. Hanna Company, an Ohio corporation.

At the time of filing his complaint, plaintiff was the equitable owner of 300 shares of the common stock of Pittsburgh Consolidation and since 1954 has been the registered holder of 500 of the more than 2 Million issued and outstanding shares of the company.

The complaint contains four causes of action, in which the plaintiff complains of transactions authorized and policies adopted by the board of directors of Pittsburgh Consolidation, and seeks an accounting of profits allegedly made by defendants, together with an accounting for damages to the corporation. In addition, plaintiff seeks injunctive relief on certain causes of action and the rescission of the transaction referred to in the third cause of action. Although fifteen individuals and two corporations are named as defendants, service has been obtained upon but two of the individual defendants, viz. Humphrey and Ireland and the two corporate defendants. The causes of action are set forth at great length in the complaint but may be described briefly as follows:

In the first cause of action it is alleged that certain of the individual defendants, including Humphrey and Ireland, having control of the policies of Pittsburgh Consolidation Coal Company and The M. A. Hanna Company, wrongfully caused the former to purchase the assets of The Hanna Coal Company, a subsidiary of The M. A. Hanna Company, for a greatly excessive consideration.

The gist of the second cause of action is that the individual defendants wrongfully caused Pittsburgh-Consolidation Coal Company to adopt a profit sharing retirement plan which, in effect, gave the participating employees substantially all of the benefits of stock ownership, except voting, without any payment therefor by said employees.

In the third cause of action it is claimed that the defendants wrongfully caused Pittsburgh-Consolidation Coal Company to purchase the 60,000 shares of its own stock for cash and immediately to re-sell the shares to the defendants Humphrey and Ireland and the named defendant Love, upon liberal credit terms which required annual payments of principal and interest in amounts substantially less than the dividends declared on said stock

and which involved no personal liability to the individual purchasers.

The fourth cause of action is based upon the claim that the defendants wrongfully created a supplemental retirement account without stockholder approval.

This action was filed in May, 1950 and the challenged transactions were consummated in the years 1946 and 1947. The Motion for Summary Judgment filed by the defendants was argued on October 10, 1952 and on January 16, 1953 the motion was overruled. Shortly, thereafter plaintiff filed a similar action in the U. S. District Court for the Western District of Pennsylvania against the corporation and the directors not served in this case. The Pennsylvania action was dismissed because of plaintiff's failure to furnish security for the corporation's costs as required by the laws of that state. Thereafter, on August 24, 1954, Pittsburgh Consolidation Coal Company filed a motion in this case to require plaintiff to post a bond for costs as required by the Pennsylvania statute. Holding that the Pennsylvania statute had no extraterritorial effect, this Court overruled the motion, 130 F.Supp. 142.

For various reasons unnecessary to be stated here, the trial of this action was delayed until January 14, 1958. At the commencement of the trial plaintiff's counsel announced that no evidence would be offered in support of the allegations of the first cause of action. Referring to the transaction described in that cause of action, counsel said: "Not only do we have no evidence but that the evidence that we do know about indicates that it was a fair transaction and a proper one." At the close of plaintiff's opening statement, and upon motion of defendants, the first cause of action was dismissed as to all defendants. Inasmuch as this was the only cause of action involving the defendant M. A. Hanna Company, the dismissal of that cause of action resulted in a dismissal of Hanna as a party defendant.

In his opening statement plaintiff also indicated that no affirmative relief would be sought on the fourth cause of action. No evidence relevant to the allegations of that cause of action was submitted except such as related to the ratification by the stockholders in 1953 of the establishment of a supplemental retirement fund. The trial proceeded on the issues raised by the second and third causes of action. Reference will be made hereinafter to the relevant facts of these causes.

Pittsburgh Consolidation Coal Company was organized in November 1945 as a result of the merger of the Pittsburgh Coal Company of Pennsylvania and The Consolidation Coal Company of Delaware. Prior to the merger Pittsburgh Coal Company, which had been in existence for many years, paid no dividends to its shareholders of common stock, and in 1945 the arrearages on its preferred stock amounted to about $100 per share. The financial record of The Consolidation Coal Company was not much better. In the years of its separate existence Consolidation had twice been in receivership and the total amount of dividends paid to its shareholders did not exceed $1 per share. Shortly after the merger Pittsburgh Consolidation purchased the assets of the Hanna Coal Company, a wholly owned subsidiary of M. A. Hanna Company, and paid therefor 325,000 shares of its common stock. The acquisition of this stock by Hanna, plus the shares received by it at the time of the merger in exchange for its holdings in the Consolidation Coal Company, gave Hanna a 38% interest in the stock of Pittsburgh Consolidation. This proportionate interest was later reduced to and has remained at approximately 35%. At the time of the merger, the Mellon interests of Pittsburgh exchanged their holdings in Pittsburgh Coal Company for a substantial number of shares of the common stock of the new corporation. The interest of Mellons in the new corporation represents about 12% of its total outstanding stock. The new corporation prospered from the outset. Its earnings have been substantial. Each year since 1945 it has paid dividends to its shareholders ranging in amounts from

$1.40 per share to $3.00 per share. The common stock of the company has shown a steady and substantial enhancement in market value, and in 1956 its shares were split 3 for 1. In addition to its remarkable financial record, the company is now reputed to be the largest coal producing company in the world.

### The Pleadings

The complaint contains the general averment that Humphrey, Ireland and Love, through their ownership of stock, controlled The M. A. Hanna Company and that Hanna, through its stockholdings in Pittsburgh Consolidation Coal Company, controlled the board of directors of that company; that Humphrey, Ireland and Love were directors and, at times, officers of both companies, and through their alleged control dominated the board of directors of Pittsburgh Consolidation. It should be noted again that although named as a party defendant, Love was not served with process and is not a party defendant in this action.

In his complaint plaintiff alleges that no demand was made on the board of directors to institute suit; that such demand would have been futile because of the alleged control and the fact that the directors would have had to bring the action against themselves. In their answer defendants deny any breach of their fiduciary duties as alleged in the complaint and in addition assert the following defenses:

(1) That plaintiff fails to state a claim upon which relief can be granted;

(2) That plaintiff has failed to comply with the provisions of Rule 23(b) of the Federal Rules of Civil Procedure, 28 U. S.C.A.;

(3) Laches;

(4) Estoppel; and

(5) That the Management Unit Plan was ratified and approved by the stockholders on April 18, 1951.

### Second Cause of Action

In support of the defense of laches it is urged that plaintiff had de-tailed information about the Management Unit Plan as early as 1947 but made no objection thereto until 3½ years after its adoption and then only by the filing of this action. Ordinarily it would be contrary to settled equitable principles to permit a stockholder to stand by and allow the directors to adopt a plan and voice no objection thereto until valuable rights were acquired thereunder. However, the agreements under the plan were cancellable by the company within 5 years after their execution and at the time this action was commenced the rights acquired and obligations assumed under the agreements were subject to divestment and revocation at the election of the company at any time within a year and a half after suit was filed. I am of the opinion and hold that in these circumstances the doctrine of laches has no application. In justification of his failure to seek relief from the board of directors or the shareholders of the corporation before bringing this suit, plaintiff avers that he made no demand upon the directors or shareholders as required by Rule 23(b) F.R.C.P. because such action on his part would have been futile. The evidence supports plaintiff's position in this regard. I therefore adhere to the ruling heretofore made on this question in denying defendant's Motion for Summary Judgment. Nor does the evidence warrant a determination that plaintiff is estopped from maintaining this action.

### The Facts

Because of the peculiar procedural and substantive issues involved a somewhat lengthy recitation of the facts is essential to an understanding of the decision reached.

On November 18, 1946 the board of directors approved a profit sharing and retirement plan, herein referred to as the "Management Unit Plan." The profit sharing aspects of the plan are succinctly stated in defendant's trial brief as follows:

"In essence, the plan was as follows: Any employee entering the Plan was given his choice of sign-

ing any one of three different types of agreement. Under all the agreements the employee was assigned a certain number of units (varying from 400 to 10,000 units). These units were assigned a dollar value per unit based upon the current market value of Pitt-Consol's common stock. All of the units were originally assigned at $18 per unit. When Pitt-Consol paid dividends each employee received an amount for each unit equivalent to the dividend paid on each share of stock. If he signed an Employee Bonus and Retirement Agreement No. 1, he got all such payments immediately in cash; if he signed an Employee Bonus and Retirement Agreement No. 2, he got half immediately in cash and the other half was credited to his retirement fund; and if he signed an Employee Retirement Agreement, all such payments were credited to his retirement fund."

In addition, the company agreed to pay the unit holders upon retirement at age 65, or upon termination of employment at any time due to sickness or death, a sum equal to the increased value, if any, of the units to which an employee was entitled, measured by the increased value, if any, of an equal number of shares of common stock; the market value of the common stock to be determined as of the date of the termination of employment or as of such other date within 5 years thereafter as the employee shall select. The retirement benefits were payable in 10 annual installments to the employee, his heirs or personal representatives. Provision was also made in the agreements for the payment of similar retirement benefits to those unit holders who, after 5 years from the date of the agreements, were discharged or quit voluntarily before age 65 or whose agreements were terminated by the company. The agreements, or any rights thereunder, were not assignable except with the consent of the company.

The plan also provided that the number of units held by an employee should be increased proportionately in the event of a stock dividend or a split of shares resulting in an over-all increase in the outstanding number of shares of common stock. The right of the unit holders to receive the increased value of their units was conditioned upon their continued employment with the company for a period of 5 years unless the employment was terminated earlier by sickness or death or retirement at age 65. The company reserved the right to terminate any agreement within 5 years after its date. There were many other provisions in the agreements but for the purposes of this case the foregoing is a sufficient statement of the essential terms of the plan. The benefits of the plan were available to executive personnel of the company and were designed to provide added incentive to key employees and to insure their continuity of employment with the company. Initially about 105,000 units were assigned to 34 key employees at a valuation of $18 per unit. This was equivalent roughly to the then market value of the common stock. Of the 34 original participating employees only two, Love, who received 10,000 units, and Morrow, to whom there was assigned 5,000 units, were directors. Kratz, who also participated, was secretary of the company but did not become a director until 2 years after the adoption of the plan. Neither Humphrey nor Ireland, the only individual parties defendant in this action, were assigned units at the time the plan was adopted or at any time thereafter. The plan was described in considerable detail in the 1947 Proxy Statement and many of its essential terms were summarized in the Proxy Statements of 1948 and 1949. On April 19, 1948 the Executive Committee authorized the issuance of additional units not to exceed an aggregate of 200,000. Early in 1951 the company called in all outstanding agreements and issued in exchange therefor amended agreements in which, among other things, it was

provided that in order to choose a date within 5 years after termination of employment for determining the market value of the shares, the employee was required to notify the company 10 days in advance of the date selected by him. This amendment was designed to eliminate plaintiff's objection that the original 5 year provision permitted an employee to defer his selection of a market value date until the end of the 5 year period after his employment terminated and then retroactively to choose a date within that time when the market value of the stock was at its highest point.

On February 12, 1951 the board of directors voted to submit the Management Unit Plan, as amended, to the shareholders for ratification and also to submit to the shareholders a proposal to increase the authorized capital stock from 2,320,000 to 3,000,000 shares.

On February 14, 1951 notice was sent to the stockholders stating that the purposes of the shareholders' meeting of April 18, 1951 were:

1. To elect directors.

2. To increase the authorized stock of the corporation to 3,000,000 shares.

On March 23, 1951 a supplemental notice was sent to the shareholders in respect of an additional proposal to be considered at the annual meeting as follows:

"To consider and take action upon the proposal to set aside and reserve 200,000 shares of the Company's authorized but unissued Common Stock for issue and sale from time to time in the discretion of the Board of Directors if it shall so determine in connection with retirements of employees covered by the Company's Management Unit Plan as set forth in the attached Proxy Statement.

"The accompanying Proxy Statement read as follows:

" 'III. Reservation of Common Stock in Connection with Retirements covered by Management Unit Plan

" 'The Company's Management Unit Plan was adopted by the Board of Directors on November 18, 1946 and became effective January 1, 1947. It was summarized in the Proxy Statement for the Annual Meeting held on April 16, 1947 but no action was requested with respect to it. The Plan was embodied in certain Employee Bonus and Retirement Agreements which were revocable within five years, and recently the Board has amended and clarified the terms of the agreements in certain relatively minor respects.

" 'In adopting the Plan and more recently in voting to continue it with such amendments, the Board had in mind that the degree of success of a corporation in the bituminous coal industry, with its many problems, is largely dependent upon the effectiveness and efficiency of its key personnel. Accordingly, it is believed to be in the interest of the shareholders to establish methods of remuneration likely to attract to the company men of ability and to maintain their interest in its success. The Management Unit Plan was devised to provide a method of compensation for key personnel which would bear a relation to the actual increase in value to shareholders of their own investment return and market value.

" 'Under the Plan, the Board of Directors authorized the Executive Committee to allocate up to 200,000 units from time to time in its discretion. Units are allocated at base values per unit representing the approximate market value of the Company's Common Stock at the time of allocation. 127,000 units have been allocated to 37 employees, including 10,000 to Mr. Love and 5,000 to Mr. Morrow as reported in the 1947 Proxy Statement, and 5,000 in 1947 to Mr. Kratz. Of such units, 105,000 were allocated at a base value of $18 per unit and the

balance at base values ranging from $21 to $29 per unit. The market value of the Common Stock on the New York Stock Exchange ranged during 1950 from a low of $25⅛ to a high of $40 per share.

" 'The Agreements carrying out the Plan provide for retirement benefits extending over a ten-year period after retirement. These benefits include an annual payment equal to one-tenth of the excess, if any, of the market value, determined as provided in the agreements, of a number of shares of Common Stock equal to the number of units to which the employee is then entitled under the agreement, over the base value at the time of allocation of the number of units originally allocated to him, with interest at 3% per annum on unpaid balances beginning after retirement.

" 'In addition, the agreements provide other benefits measured by dividends paid on the Common Stock. Such benefits are of three types depending on the type of agreement in effect with the particular employee, and, accordingly, when the Company declares any dividends on its Common Stock, it is required either (i) to pay the employee a sum equal to the dividend per share of Common Stock multiplied by the number of units allocated to him, or (ii) to credit that amount to a special account for payment to the employee over a ten-year period after retirement, or (iii) to pay the employee one-half that amount and to credit the other half to a special account to be paid to him over a ten-year period after retirement.

" 'The foregoing summary is intended to bear upon the reason for the reservation of shares as to which the Board is recommending action by the shareholders. The agreements also contain numerous other provisions relating, among other things, to the effect of termination of the agreements, payment of bene-fits if employment terminated by illness or if, after five years from the date of the agreement, the Company terminates the agreement or discharges the employee, non-assignability of rights by the employee without the Company's consent, payments to heirs in the event of the employee's death, the right to select a value date within five years after retirement, and the method of determining market values.

" 'The Board on February 12, 1951 adopted a resolution recommending to the shareholders that they take action at the Annual Meeting setting aside and reserving 200,000 shares of the authorized but unissued Common Stock of the Company for subsequent issue and sale from time to time at the then current market values, in the discretion of the Board of Directors, if and as it deems it desirable so to provide funds in connection with retirements of employees covered by the Company's Management Unit Plan. In this way, funds can be provided, if advisable, which will more than cover that portion of the retirement benefits under the Management Unit Plan which are measured by any increase in the market value of the Common Stock of the Company, without affecting the Company's working capital. For example, if a retiring employee had units allocated to him at a base value of $20 per unit, being the approximate market value of the Common Stock at the time of allocation, and his retirement benefits were to be measured by a subsequent market value of $40 per share, the sale at $40 of a number of shares of Common Stock equal to the number of units allocated to that employee would obviously produce funds substantially greater than the payments measured by the difference in value.

" 'The vote of the holders of a majority of the outstanding shares entitled to vote at the meeting is required for the approval of the pro-

posed reservation of 200,000 shares of the Common Stock.' "

At the shareholders' meeting on April 18, 1951 the proposal to reserve 200,000 shares of stock for the purposes above referred to was approved by approximately 90% of the disinterested shares entitled to vote. At this meeting the shareholders voted for the election of directors and to increase the authorized capital stock of the company to 3,000,000 shares. However, the Management Unit Plan, as such, was not submitted to the stockholders for approval. On February 16, 1956 the company split its common shares three for one, thereby trebling the number of units held by employees participating in the plan. In June 1956 the corporation again amended the Management Unit Agreements. One of the provisions of the agreements, as last amended, shortened the period within which retiring employees could select a value date from 5 years to 2 years after their employment was terminated. On December 31, 1957, 16 employees, or their personal representatives, were receiving payments from the retirement fund. More than 25 other unit holders had been employees for more than 5 years since becoming participants in the plan and more than 40 other employees who worked less than 5 years were parties to such agreements. As of December 31, 1956 over $2,000,000 had been set aside as a reserve to meet the company's obligations under the agreements.

As of December 31, 1957 there were 346,750 units outstanding and an unknown number of authorized but unissued units. The shares of common stock of the company are publicly held and are listed and dealt in on the New York Stock Exchange.

### Discussion

In his complaint the plaintiff attacks the plan as inequitable and unfair to the corporation. He claims it constitutes a waste of corporate assets and is a device whereby the directors and officers conferred upon themselves substantially all the rights of shareholders without risk of loss and without capital investment. He alleges further that the obligations of the company to pay retiring employees the difference in the appreciated value of the units based upon increased market value of the stock, imposed upon the company the liability of an indefinite amount for an indeterminate term. In his brief plaintiff attacks the plan on two major grounds:

"(1) The entire plan amounts to the creation of a new class of stock —and its issuance without complying with the provisions of the Pennsylvania Constitution and statutes is illegal;

"(2) In addition the provisions for payment out of the Company's funds of 'stock market appreciation' and the 'five year look-back' provisions are invalid because they have no reasonable relation to the value of the services for which the units were given."

Defendants deny the allegations of inequity and unfairness and that the plan constitutes a waste of assets. They admit that the plan confers upon the unit holders some but not all of the rights of shareholders and assert that the plan was intended as an incentive to the important executives of the company and that the operations of the company have been profitable; that the success of the company is to a large degree attributable to the incentives provided by the plan. Defendants further aver that the plan was disclosed fully to the shareholders in the 1947 Proxy Statement and ratified by them at the annual meeting in April 1951 and that the plan is in all respects valid.

By way of relief plaintiff asks a recovery of profits and an accounting for all damage sustained by the corporation. He also prays for an injunction restraining the defendants from causing or permitting the corporation to make any further payments under the plan or to set aside reserves for such purpose and for an order requiring defendants to restore to the general fund all moneys heretofore set aside and reserved for the purposes of the plan.

■ While the plaintiff does not pray that the agreements under the plan be cancelled, the relief he seeks, if granted, would be effective to destroy the vested rights of over 40 participants in the plan who have either retired or worked more than 5 years pursuant to agreements under the plan. The granting of such relief would also impair the contractual rights of participating employees who have worked less than 5 years. If the corporation were enjoined from making any further payments or maintaining reserves necessary for such purpose the effect would be to prevent the further payment of accrued retirement benefits to former employees and to deny to those who have worked for more than 5 years under the plan the right to receive their current profit sharing benefits and their further right to retirement benefits upon the termination of their employment. Such a restraining order would also prevent payments of amounts equal to dividends multiplied by the number of units held to those employees who have worked less than 5 years under their agreements. It is obvious that the injunctive relief prayed for cannot be granted. None of the officers or employees with whom the corporation entered into agreements under the plan are parties to this action. It is fundamental that it is not within the power of courts of equity to make a binding adjudication of the rights in personam of parties not brought before the court by due process of law. Shields v. Barrow, 17 How. 129, 58 U.S. 129, 15 L.Ed. 158; State of Minnesota v. Northern Securities, 184 U.S. 199, 22 S.Ct. 308, 46 L.Ed. 499; Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80; National Licorice Co. v. N.L.R.B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; State of Texas v. Interstate Commerce Commission, 258 U.S. 158, 163, 42 S.Ct. 261, 66 L.Ed. 531; Tucker v. National Linen Service Co., 5 Cir., 200 F.2d 858; Elster v. American Airlines, Del.Ch., 106 A.2d 202; Moore's Fed. Prac. Vol. 3, pp. 2150 et seq.

■ While this court is without power to inquire into the validity of the plan for the purpose of determining the rights thereunder of unit holders not parties to this action, it does not follow that the court may not investigate the merits of the plan to determine whether plaintiff is entitled to any relief against the parties defendant in this action. Plaintiff has misconceived the nature of the relief to which he would be entitled if he prevails and has failed to appreciate the scope of such relief and its effect upon the rights of absent parties. But this constitutes no good reason for dismissing the complaint. It is settled that in a trial upon the merits a suitor is entitled to relief appropriate to the established facts, whether he has prayed for it or not. Bemis Bros. Bag Co. v. U. S., 289 U.S. 28, 53 S.Ct. 454, 77 L.Ed. 1011; Rule 54(c), F.R.C.P. The Court may, therefore, disregard the prayer for injunctive relief in the complaint or order it stricken and proceed to determine the merits of the plan for the purpose of doing justice between the parties in the case. There can be no valid objection to such procedure provided a final decree can be made without affecting the interest of absent parties "or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Shields v. Barrow, supra. That such a decree can be made seems beyond question. Plaintiff now asks an order restraining the defendants from issuing any further units or entering into any further agreements under the plan. The parties in the case concede the power of a court to determine the issue raised. Whatever determination is here made can have no binding or res adjudicata effect upon interested absent parties.

■ The question presented is a pioneer one. Although there are many cases in the books involving the propriety and legality of additional compensation paid pursuant to executive compensation plans, diligent research by counsel and the court has failed to reveal any reported decision that is even remotely analogous on its facts. However, the Court may look for guidance to the well

settled principle that the authorized compensation must bear a reasonable relation to the value of the services of the employee. Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385; Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87.

Most incentive plans heretofore in effect have provided for stock options, a stipulated bonus or a percentage of net profits as additional compensation to a corporation's key personnel. The Management Unit Plan is novel and unique. It was the first profit sharing and retirement plan to provide additional annual compensation equal in amount to dividends multiplied by the number of units held by an employee plus deferred compensation upon retirement based upon the rise in market value of the stock during the period of employment. Since this plan became effective other corporations have adopted profit sharing and deferred compensation plans based upon the formula of additional current compensation measured by dividends and deferred compensation based upon the increased market value of the corporation's common stock. However, the plan here in question is the first of such plans to be challenged in litigation.

Plaintiff's first contention is that each unit issued under the plan is the equivalent of a share of stock and must be paid for in full. In support of this argument he cites and relies upon Article XVI, Sec. 7 of the Pennsylvania State Constitution, P.S., which provides:

"No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void."

And, 15 Pa.Stat. § 2852–603 providing that:

"Consideration for shares.

"A. Shares of a business corporation shall not be issued except for money, labor done, or money or property actually received * * *."

After 5 years of service under the plan, unit holders enjoy all of the financial benefits of shareholders. However, they acquire no proprietary interest in the corporation. They cannot vote at shareholders' meetings. They have no right to inspect the books of the corporation. They cannot institute suit on its behalf nor can they alienate their units or transfer rights thereunder without the corporation's consent. A unit holder's interest in the profits and increased market value of the stock is contingent upon his employment and arises by virtue of his agreement under the plan. In these and other respects the rights of a unit holder differ from those of a stockholder. The issuance of units, unlike the issuance of shares of stock, does not alter the capital structure of a corporation and those who deal with it are not misled as to its apparent resources, as would be the case if shares of watered stock were issued. Houghten v. Restland Memorial Park, 343 Pa. 625, 23 A.2d 497; Grafton v. Marsteller, 3 Cir., 232 F.2d 773. It must be held therefore that a unit issued under the plan is not the legal equivalent of a share of stock.

Notwithstanding the distinction noted above, the assignment of units is tantamount to the allocation of hypothetical shares of stock that entitle the unit holders to all the financial benefits of stock ownership without any investment of capital.

The important question to be determined therefore is whether the financial benefits of such hypothetical shares of stock bear a reasonable relation to the value of the services of the employees to whom the units are issued. Plaintiff makes no objection to that part of the plan that entitles an employee to receive current compensation in addition to his salary in amounts equal to dividends multiplied by the number of units he holds. As to this provision of the plan, plaintiff concedes there is a reasonable relation between such additional current payments and the value of the services ren-

dered by the employees. Plaintiff contends, however, that there is no reasonable relation between the further additional compensation provided by the plan which is based upon the increased market value of the stock at the time of an employee's retirement. It is plaintiff's position that the terms of the plan that provide an award of additional retirement benefits equal to the increase in the market value of the stock during the period of employment are unreasonable and unfair to the corporation and its shareholders. That the market value of the stock of a corporation is an unreliable index of the value of services rendered by its key employees must be conceded. Indeed such a concession is implicit in the provisions of the plan that grant a retiring employee the right to select a market value date at any time within 2 years after the termination of his employment. If a true relationship existed between the increase in market value and the value of an employee's services there would be no need for such provision.

■■■■■ The market value of stock is governed by many factors unrelated to the services of employees of a corporation. It is common knowledge that the general state of the economy of the country—the confidence or lack of confidence of investors—the cost of money—the supply of stock available in the market—inflationary or deflationary trends—the tendency of the market to discount the future and many other extraneous factors, play an important part in the fluctuations of the market. The earnings of a corporation are an important, if not the most important, element in the long range action of the market. But inasmuch as other unrelated factors are considered by the investing public in its evaluation of shares of stock it cannot be said that market value represents the intrinsic worth of a stock or that an increase in market value fairly reflects the value of services rendered by a corpora-

tion's key employees. The Management Unit Plan represents a radical departure from all other executive compensation plans. While it cannot be condemned solely on the ground of its novelty, it must meet the test of reasonableness which governs in all cases where the validity of such plans is challenged. This test requires that the compensation provided bear a reasonable degree of equivalence to the value of the services. The governing principles are succinctly stated in Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87, 113, as follows:

"We have long since passed the stage in which stockholders, who merely invest capital and leave it wholly to management to make it fruitful, can make absolutely exclusive claim to all profits against those whose labor, skill, ability, judgment and effort have made profits available. *The reward, however, must have reasonable relation to the value of the services for which it is given* and must not be, in whole or in part, a misuse or waste of corporate funds, or a gift to a favored few, or a scheme to distribute profits under a mere guise of compensation but in fact having no relation to services rendered." Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385. (Emphasis supplied.)

[1] The plan here in question bears no evidence of any purpose to equate compensation with the value of services. It fixes no percentage of earnings to which those participating in the plan are entitled as a group or as individuals. Nor does the plan prescribe any other rational method of determining compensation in relation to the value of services. The amount of retirement benefits an employee is entitled to receive is governed by aleatory considerations capable of producing incongruous results that could well be avoided if compensation were related reasonably to the value of services. To illustrate: Under the plan, an employee

1. (Unless otherwise indicated, the discussion which follows relates to the in-

creased market value formula of computing retirement benefits.)

to whom 5,000 units were assigned might work 30 years before reaching the age of 65 and retire at a time the market value of the stock was no higher than it was at the time his units were assigned. This condition might be caused primarily by a sudden and deep decline in market value following many years of profitable operation of the business during which the employee rendered unusually valuable services yet the employee would not be entitled to receive any retirement benefits. Another employee in a less responsible position holding only 1,000 units might terminate his employment after 5 years and at a time when the market value of the stock was $50 a share higher than when his employment commenced. Such an employee would be entitled to retirement benefits of $50,000 even though his services were of less value and of shorter duration than the employee referred to in the first example cited above. A determination of the amount an employee is entitled to receive must await the termination of his employment and is then computed on the basis of the increase in market value at that time irrespective of the length, quality and value of the services rendered during the period of employment.

Another serious defect in the plan is the absence of any limitation on the amount an employee may receive as retirement benefits. This creates a situation where in times of prosperous business and rising market prices the company may be obligated to pay retirement benefits in amounts grossly disproportionate to the value of services and which in whole or in part constitute waste or a misuse of corporate funds. It is sufficient indication of the potentialities of the plan in this regard to note the tremendous increase in the value of the stock since the original units were assigned. At that time the market value of the stock was $18 per share. At the time of the three for one stock split in February 1956 the market value had risen to about $104 per share. In the early part of 1957 the stock sold as high as 46½ for each new share, or a value of $139.50 for each share of the old stock. At the end of 1957 the market value of the shares declined to about 31¾ for each new share, or approximately $95 per share for the old shares. It puts no strain on the imagination to envision the possibilities of waste and misuse of corporate funds that can result from the operation of the plan in a period of general prosperity.

The plan rests on the postulate that an increase in the market value of the stock is attributable solely to the extraordinary services rendered by unit holders in response to the incentive of additional compensation. Such an assumption is demonstrably false. It takes no account of the services rendered by top executives such as Humphrey and Ireland and other executive officers who have declined participation in the plan but whose valuable services have contributed substantially to increase the earnings and net worth of the corporation. The plan also ignores the influence on the net worth of the corporation of nonrecurring capital gains derived from the sale of capital assets in which transactions only one or a few executives participate but in the fruits of which all of the unit holders share. And, as above indicated, the unit holders also share in the increase in the market value of the stock caused by the favorable operation of extraneous factors not even remotely related to the services rendered. Under the design of the plan the unit holder who remains with the corporation for 5 years enjoys all the financial benefits of stock ownership to the same extent as a stockholder who owns shares equal in number to the units assigned to an employee. A shareholder risks the loss of his capital investment and for that reason is entitled to participate fully in the gains of the corporation from whatever source derived. The unit holder who acquires all of such rights incurs no risk of loss of capital or loss of salary. To say that he risks the loss of his retirement benefits is not an accurate statement. Before retirement the unit holder has no enforcible claim for deferred compensation against the corporation. If at

the time of retirement the unit holder is entitled to no retirement benefits he suffers no loss. When a stockholder sells his shares the sale is made without expense to the corporation. A stockholder who sells receives his capital investment and the increased value of his shares from a purchaser in the market. However, a unit holder's gains are paid by the corporation and constitute an addition to the cost of operating the business. There may be rare occasions when fortuitously the amount of the awards bear a relation to the value of the services. But the irrational method of compensation provided by the plan is not designed to produce such results. Rather it is calculated to impose obligations upon the corporation which in reason it ought not be required to assume. By way of justifying the generous awards provided by the plan it is urged that they supply a maximum of incentive to the unit holders. While the incentive was designed to stimulate the efforts of the unit holders it did not and could not confer upon them the right to share in the fruits of the efforts of others. Nor does it endow them with competence to control or regulate those extraneous forces upon whose favorable operation the success of the business and an increase in market value of the shares so largely depend. There can be no valid objection to the view that executive employees merit extra compensation for extraordinary effort or ability resulting in increases in the net worth of the corporation. However, the law requires that the amount of the award be measured by the value of the services rendered. This does not mean that the value of services must be balanced precisely or with mathematical accuracy against the amounts of the awards but it does mean that there must be a reasonable approximation of the true relation between compensation and the value of services. The plan provides for no such relation. It was not designed to do so. As stated in the 1951 Proxy Statement quoted above:

"The Management Unit Plan was designed to provide a method of compensation for key personnel which would bear a relation to the actual increase in value to the shareholders of their investment return and market value."

The stated purpose was accomplished by awarding units representing hypothetical shares of stock which after 5 years of employment under the plan confer upon the holders thereof all the financial benefits of stock ownership without requiring the investment of a single dollar of capital.

No serious objection could be made to the payment of additional current compensation based upon dividends multiplied by the number of units held by an employee if such payments were the only additional compensation provided by the plan. Standing alone, such payments might well be regarded as representing a distribution of current earnings bearing a reasonable relation to the value of services rendered. But the provision of the plan awarding further compensation equal to the increased value of the common stock at the time employment terminates has no relation to the value of services. As shown above, the amount of such award, if any, that a retiring employee receives is determined solely by the market value of the stock at the time his employment ends irrespective of the value of the services rendered during the period of employment. That the corporation was aware of the absence of a relation between compensation based upon increased market value and the value of services of an employee is evidenced by the terms of the plan that grant an employee retiring at age 65 the absolute right to defer his selection of a market value date for a period of 2 years after his retirement; and by the further provision that permits the board of directors to extend the selection of a value date for a similar period in cases where employment is terminated after 5 years of service. Under the increased market value formula employees are entitled to receive awards which if received by a shareholder would be capital gains. Heretofore it has been considered that only shareholders were

entitled to such gains. The provision in question introduces a new concept and places unit holders on a parity with shareholders in respect of capital gains and provides for their payment under the guise of compensation having no relation to services rendered. I am of the opinion, and hold, that the method of compensation thus provided is per se unreasonable and invalid. I am of the opinion also that those provisions of the plan that grant retiring employees the right to defer the selection of a value date are per se unreasonable. Manifestly, any payment of an award resulting from an increase in market value occurring after an employee has ceased working for the corporation would be a gift and a clear misuse of corporate funds.

Defendant argues:

"Even if the Unit Plan had been overly generous or otherwise questionable when it was adopted, it has now been approved by 97½% of the shareholders present at the 1951 Annual Meeting and plaintiff is bound by their vote."

I find no evidence in the record tending to show an effective ratification of the Management Unit Plan. After this action was commenced the board of directors on February 12, 1951 voted to submit the plan to the shareholders at the 1951 Annual Meeting. However, the shareholders were not requested to vote on the plan. Instead there was presented to the shareholders a proposal authorizing the setting aside of 200,000 shares of authorized but unissued common stock for issue and sale from time to time in the discretion of the board of directors to provide funds in connection with the retirement of employees covered by the Management Unit Plan. The Proxy Statement forwarded to the shareholders is set out in full in the Statement of Facts. Reference thereto will disclose that the statement contains a summary of the basic compensation provisions of the plan followed by the statement that

"The foregoing summary is intended to bear upon the reason for

the reservation of shares as to which the board is recommending action by the shareholders."

The action the shareholders were asked to take is also clearly outlined in the final paragraph of the Proxy Statement as follows:

"The vote of the holders of a majority of the outstanding shares entitled to vote at the meeting is required for the approval of the proposed reservation of 200,000 shares of common stock."

The above quoted statements, together with the general tenor of the Proxy Statement as a whole, show clearly that the proposal submitted to the shareholders did not contemplate or request an approval of the Management Unit Plan. Shareholder approval was sought on the proposal to implement the plan by the issuance and sale of stock but no approval of the plan itself was sought. However, even if contrary to the fact such proposal be considered as a submission of the plan for approval, it must nevertheless be held that there was no effective ratification. While the Proxy Statement fairly summarized the basic compensation provisions of the plan, it contained no summary of numerous other important terms of the plan which were merely referred to in the statement. The shareholders were not informed that if employment was terminated at any time by reason of illness the company would be required to pay the employee an amount equal to the increased market value of the common stock multiplied by the number of units assigned to the employee. Nor were the shareholders advised that if agreements were terminated by the corporation after 5 years or if an employee was discharged or quit after that time the company would be required to pay benefits in similar amounts to the employees in question. There was no reference in the Proxy Statement relative to the increase in the number of units to which an employee would be entitled in the event of a stock dividend or a split in the shares resulting in an overall increase in the number of shares outstanding. These

were important matters upon which the shareholders were entitled to be fully informed. As was said in Lutherland, Inc., v. Dahlen, 357 Pa. 143, 53 A.2d 143, 148:

"When an officer of a corporation seeks the shareholders' approval of a transaction in which he stands to profit at the expense of the corporation every element and fact involved must be revealed by him if such approval is to have any legal effect."

■ Of primary importance in determining whether there was a ratification of the plan is the type of notice given to the shareholders. The 1951 Proxy Statement did not put the shareholders on notice that they were expected to vote on the plan itself. The absence of such notice is alone sufficient to defeat the claim of ratification. As the court said in Kerbs v. California Eastern Airlines, Inc., 33 Del.Ch. 69, 90 A.2d 652, 659, 34 A.L.R.2d 839:

"Necessarily the effectiveness of such ratification depends upon the type of notice sent to the stockholders and on the explanation to them of the plan itself. * * *"

The burden of showing that ratification has been made with full knowledge of the facts is upon the party alleging it. Fletcher Cyc. Corporations, Vol. 2, § 780. Defendants have not sustained this burden. I hold, therefore, that there was no effective ratification of the Management Unit Plan.

■ Although the determinations hereinabove made are adverse to the defendants there is no evidence of fraud or self-dealing on their part in connection with the adoption or operation of the plan. The plan was patterned after a similar plan of The H. J. Heinz Company which provided for the issuance of units and the payment of compensation based upon dividends multiplied by the number of units assigned to the employees. The Heinz plan, however, differed significantly from the Management Unit Plan in that under the former retirement benefits were computed on the basis of the increased book value of the company's shares rather than upon the increased market value thereof. There are other differences in the respective plans unnecessary to be stated. After examining the Heinz plan the president of defendant corporation sought the opinion of counsel on the legality of adapting the principles of the Heinz plan to a similar plan for this corporation. According to the testimony of the president, the Management Unit Plan was approved by counsel in the form in which it was adopted. The individual defendants in this case had no personal stake in the adoption of the plan and in approving it they undoubtedly acted in the honest belief that it was fair and would be beneficial to the interests of the corporation. These and other circumstances shown by the evidence negate any suggestion of fraud or self-dealing. By reason of their nonparticipation in the plan the defendants derived no profits therefrom and are entitled to a judgment on the merits on plaintiff's prayer for recovery of profits. The absence of power to determine whether the corporation has suffered a loss compels the dismissal of that part of the complaint seeking the recovery of damages. Such dismissal will be with prejudice to any further action for damages by plaintiff against the defendants but without prejudice to any such claim as may be asserted by the corporation or any other shareholder acting in its behalf. Because of the invalidity of the plan as determined above, plaintiff is entitled to an order restraining the corporation from entering into any agreements or issuing any units in the future pursuant to the Management Unit Plan.

It is perhaps unnecessary to add that no statement, expression of opinion or finding herein made shall be construed as affecting the rights of interested persons not parties to this action.

A decree may be prepared in accordance with the foregoing.

### Third Cause of Action

Early in December 1946 the directors of The M. A. Hanna Company agreed informally to sell 60,000 shares of Pitts-

burgh-Consolidation [2] stock to Humphrey, Ireland and Love in lots of 20,000 shares each at $18 per share upon payment therefor in cash. The prospective purchasers were unable at the time to make the cash payment and sought a loan from Pittsburgh. On December 23, 1946 the Executive Committee of Pittsburgh agreed on behalf of the corporation and subject to ratification by its board of directors, to finance the purchase of the stock from Hanna by the three directors. The action of the Committee was expressed in the following resolution:

"Resolved, that this Committee does hereby approve of the purchase by this Company from The M. A. Hanna Company of 60,000 shares of the common stock of this Company at price of $18 per share for subsequent resale at same price in lots of 20,000 shares each to Messrs. G. M. Humphrey, R. L. Ireland and George H. Love upon terms and conditions to be determined later and subject to ratification by the Board of Directors of the Company at its regular meeting scheduled to be held on February 17, 1947."

Love and Ireland were present at the meeting of the Executive Committee but did not vote on the resolution. Humphrey was not present. The resolution was approved by the unanimous vote of the other four members of the Committee, none of whom was personally interested in the Hanna Company or in the purchase and sale of the stock. Thereafter the company and the three directors executed a written agreement in conformity with the terms of the resolution of the Committee. The agreement was dated December 23, 1946 but was not executed until some time later. The Board of directors of The M. A. Hanna Company took its first formal action in respect of the sale of the stock on January 9, 1947 by the adoption of the following resolution:

"Resolved, that the officers of the Company be and they are hereby au-

thorized and directed to sell to Pittsburgh-Consolidation Coal Company 60,000 shares of the capital stock of Pittsburgh-Consolidation Coal Company at $18 a share."

On February 17, 1947 the action of the Executive Committee of Pittsburgh was submitted to its board of directors, whose action thereon is recorded in the Minutes of the Board as follows:

"Following full discussion it was the consensus of opinion that it was advantageous to this Company to have the three principal executives acquire substantial personal investments in the Company's Common stock, and upon motion duly made and seconded, the following resolution was then adopted by the unanimous vote of the ten (10) directors present:

" 'Resolved, That the agreement entered into by the Company as authorized by the Executive Committee for the purchase from The M. A. Hanna Company of 60,000 shares of the Common stock of this Company at a price of $18 per share conditioned upon the resale of said stock at the same price in lots of 20,000 shares each to Messrs. George M. Humphrey, R. L. Ireland and George H. Love, as their individual investment, and the agreement of said Committee for and on behalf of this Company for sale of said shares to said parties, be and the same is hereby in all respects ratified, confirmed and approved, and the proper officers of this Company be and they are hereby authorized and directed to deliver proper certificates to said parties for the shares of stock purchased by each of them and to accept payment therefor upon the following terms and conditions.

" '$60,000 in cash upon issuance and delivery of the stock, the balance of $300,000 to be evidenced by the purchaser's promissory note in said amount with interest on unpaid bal-

2. (hereinafter referred to as Pittsburgh)

ances at 2½% per annum, payable semiannually on June 30 and December 31 of each year, payable in installments of not less than $15,000 per annum, and with the further provision that all unpaid installments and interest thereon shall forthwith become due and payable in the event of default and, in any event, at the expiration of six (6) months from the date of the termination of the purchaser's employment with the Company, said note to be secured by the pledge and deposit of the said 20,000 shares of the Common stock of this Company with right in the holder to sell the same or any part thereof upon default in payment of any amounts becoming due and payable thereunder, but without recourse beyond the deposited collateral, the purchaser to have no right whatever at any time, whether or not in default, to take down any of the pledged shares until all amounts due for both principal and interest shall have been paid in full.' "

Humphrey was not present at the meeting of the board of directors. Ireland and Love were in attendance but withdrew during the discussion and vote on the above resolution.

The Board directed that the transaction be submitted to the shareholders for ratification at the annual meeting to be held on April 16, 1947. On February 21, 1947 Pittsburgh acquired the 60,000 shares from Hanna and on February 25, 1947 Pittsburgh issued certificates of stock to Humphrey, Ireland and Love for 20,000 shares each. Each of the purchasers paid $60,000 in cash and executed promissory notes for the balance upon the terms hereinabove set forth. On March 22, 1947 Pittsburgh forwarded proxy statements to its shareholders which contained a detailed statement of the transaction, including a summary of the resolutions of the Executive Committee and the Board of Directors and the terms of the notes as stated above.

Included in the proxy statement also were the following:

"The Board of Directors believes it to be advantageous to the Company to have certain principal executives acquire substantial personal investments in the Common stock of the Company. Accordingly the Board approved the transactions described below, the three interested Directors not voting, subject to submission thereof to the shareholders for ratification. The Board recommends to the shareholders that the transactions be ratified."

"The purchase of said shares from The M. A. Hanna Company and their re-sale upon the terms outlined have been affected * * *. This Company has reserved the right, in case these transactions fail of ratification by the shareholders of this Company, to rescind the purchase and sale and restore all parties, including The M. A. Hanna Company, to the same position that they were in before the purchase."

At the shareholders' meeting on April 16, 1947, 1,779,613 shares were voted in favor of ratifying the transaction against 36,496 shares opposed. This favorable vote included the shares of Hanna and Humphrey, Ireland and Love and their families. Disregarding these shares, there were 999,656 shares of disinterested shareholders voting. Of this number 963,160 shares, or 96.35% were voted in favor of ratification. Thus the action of the Board of Directors was ratified by an overwhelming majority of the disinterested shares of stock which also constituted a substantial majority of all shares represented at the meeting.

The action of the stockholders in ratifying the transaction was disclosed in the proxy statements forwarded to the shareholders during subsequent years until the loans were paid in full. Humphrey paid the balance due on his note in September 1951, at which time the company shares were selling on the market at about $49 per share. Ireland made his final pay-

ment on the note in October 1951 at a time when the common stock of the company was selling on the market at about $50 per share. Love paid the balance due on his loan in July of 1955.

Plaintiff's attack upon the transaction is based upon a multiplicity of grounds in support of which he advances extended arguments that, for the most part, are premised upon inferences drawn from the records of Pittsburgh and Hanna and from oral statements of the defendants. A review of all of plaintiff's contentions would serve no useful purpose. This discussion will, therefore, be limited to a consideration of those claims upon which plaintiff most strongly relies, which may be summarized as follows:

(1) Misrepresentation of facts to the directors and stockholders.

(2) Non-disclosure of material facts to directors and stockholders.

(3) Disregard of corporation's financial interest for the benefit of the three directors.

(4) Lack of consideration for the corporation's act.

The foregoing contentions will be discussed in the order stated above.

■ It is settled in most jurisdictions, including Pennsylvania, whose law governs here, that contracts between a director and his corporation where the latter is represented by a majority of the board are not invalid merely because of the relationship of the parties. If such contracts are not unfair to the corporation and the majority of the board has acted in good faith, the contracts will be upheld. However, such contracts may be set aside if the contracting director has acted fraudulently or secured an unfair advantage and fraud is sufficiently pleaded and proved. 3 Fletcher Cyc. Corp. 931.

■ Where the action of the directors has been ratified by the shareholders, a complaining stockholder bears the heavy burden of proving the vitiating elements of the transaction. There must, of course, be a full and fair disclosure of all relevant facts if the shareholders' ratification is to be effective. Lutherland v. Dahlen, 357 Pa. 143, 53 A.2d 143.

Plaintiff has abandoned his original claim that the directors were under the domination and control of Humphrey, Ireland and Love. He now concedes that the alleged domination of the board was "never the domination of force or of joint financial interests * * * rather it was the domination of personality, domination of prior success * * *." It is clear that the 12 members who, in addition to Humphrey, Ireland and Love, constituted the board, were men of independent judgment, experienced in large business affairs and in no way beholden to the Hanna Company or to the three directors who represented that company on the board of directors of Pittsburgh.

■ Plaintiff asserts that at the meeting of the board of directors on February 17, 1947 Ireland, who was the presiding officer on that occasion, made false representations to the board relative to the existence and nature of the agreement authorized by the Executive Committee on December 23, 1946. It is plaintiff's claim that Ireland misrepresented the action of the Executive Committee in two respects,—first, by attempting to convey the impression that the company and the three directors had actually executed an agreement as authorized by the Executive Committee, and, secondly, in stating that Pittsburgh's purchase of the stock from Hanna was conditioned upon its sale by Pittsburgh to Humphrey, Ireland and Love. These charges are wholly without foundation. All of the directors who were present at the meeting of February 17, 1947 had received copies of the resolution of December 23, 1946. Among the directors present were members of the Executive Committee who had voted upon that resolution. At least two of the directors were lawyers and the corporation's counsel was also in attendance at the meeting. It does little credit to the intelligence of either Ireland or the other members of the Board to

suggest that in these circumstances Ireland would attempt to deceive his fellow board members or that the latter could be deceived if such an attempt were made. The representation of Ireland that the company had executed the agreement of December 23rd was true. As shown above by its resolution of February 17, 1947, the board of directors approved an agreement "entered into by the Company and authorized by the Executive Committee." The quoted language implies clearly that the agreement had been executed by the company at the time of the meeting of the board on February 17, 1947 and it appears from the evidence that the three directors executed the agreement at about the same time. The fact that the agreement was dated December 23, 1946 and not executed until some time later is without significance. The written contract simply expressed in writing the agreement between the company and the three directors as authorized by the Executive Committee. The agreement was not to become effective until ratified by the board. The ratification of the board on February 17, 1947 related back to December 23, 1946 and validated the action of the Executive Committee as of the earlier date subject to ratification by the shareholders.

Plaintiff also fails to sustain his charge that Ireland misrepresented the import of the resolution of the Executive Committee in stating to the board that the purchase of the shares from Hanna was conditioned upon their sale by Pittsburgh to the three directors at the price of $18 per share. The resolution of the Committee did not contain the word "conditioned" or "contingent" or words of similar import. However, it is settled that it is unnecessary to define a condition in precise terms. As stated in The Restatement of the Law of Contracts, § 258:

> "No particular form of words is necessary in order to create an express condition. Whether a promise is expressly conditional, and if so what is the nature of the condition, depend upon interpretation."

The text of the resolution, considered as a whole, clearly reveals the conditional character of the agreement approved by the Committee. Plaintiff insists, however, that the true character of Pittsburgh's agreement to purchase the shares is evidenced by the unconditional resolution of the board of directors of Hanna adopted on January 9, 1947. Plaintiff reasons that because the Hanna resolution authorizing the sale to Pittsburgh was unconditional in its terms, it necessarily follows that the purchase of the stock by Pittsburgh was unconditional. But it is clear that the Hanna resolution was deficient and incomplete in not including therein the condition upon which the stock was sold to Pittsburgh. The Hanna resolution was adopted more than two weeks after the action of the Executive Committee of Pittsburgh on December 23, 1946. The evidence leaves no room for doubt that at that time the board of directors of Hanna knew that the Executive Committee of Pittsburgh had agreed to buy the stock at $18 per share and re-sell it to the three directors at the same price. Nor can there be any doubt that in adopting its resolution of January 9, 1947 the board of directors of Hanna relied upon the resolution of the Executive Committee of Pittsburgh. It was never intended that Pittsburgh was to acquire absolute and unconditional ownership of the stock. Pittsburgh's role in the tri-partite transaction was that of a lender of money. Pittsburgh agreed to supply the funds necessary to enable the three directors to acquire the stock owned by Hanna at $18 per share. All of the parties to the transaction understood that Pittsburgh's interim ownership of the shares was intended to be and in fact was transitory and conditional.

In support of the claim that the stockholders were deceived, plaintiff charges that the alleged misrepresentations mentioned above were included in the proxy statement. In view of the determination hereinabove made, this charge merits no further comment. However, plaintiff as-

serts that the following representation in the proxy statement also was false:

"This Company has reserved the right in case these transactions fail of ratification by the shareholders * * * to rescind the purchase and sale and restore all parties, including The M. A. Hanna Company, to the same position that they were in before the purchase."

It is plaintiff's claim that the foregoing reservation is founded upon a provision of the December 23, 1946 agreement between Pittsburgh and the three directors which recited that if the transaction failed of ratification, the parties to the agreement were to be restored to their original positions. It is true that Hanna was not a party to this agreement but plaintiff is mistaken in his assumption that such agreement was the basis of reservation to restore Hanna to its original position. Pittsburgh's conditional purchase of the shares constituted full warrant for the reservation to restore the status quo as to Hanna if the stockholders failed to ratify the transaction.

## Alleged Non-Disclosures to Shareholders

█ The proxy statement disclosed that Humphrey was president, director and a shareholder of Hanna; that Ireland was a vice-president, director and shareholder of that corporation; that Love was a stockholder in Hanna. It was also shown in the proxy statement that Hanna owned 35.17% of the stock of Pittsburgh. The evidence discloses that the three directors owned a total of 13.48% of Hanna stock and that Humphrey and Ireland held an additional 15% as trustees. It is plaintiff's position that the failure to include the information relative to the extent of the stock ownership of the three directors in Hanna is fatal to the validity of the shareholders' ratification. Undoubtedly it would have been proper to have disclosed this information to the shareholders but considering the full disclosure of Hanna's holdings in Pittsburgh and of the fact that all three directors were stockholders in Hanna, the failure to disclose the extent of their stock ownership in that company cannot in the circumstances of this case be regarded as constituting a basis for nullifying the shareholders' ratification.

█ Plaintiff's second claim of non-disclosure of material facts is that the directors failed to inform the shareholders that it was contemplated and expected that the three directors would receive in dividends an amount sufficient to pay the principal and interest on the loans and the increased income taxes incurred thereby. It was apparent from the extremely favorable terms of the loans that if dividends in an amount equal to or greater than the then current return were paid in future years they would be sufficient to liquidate the loans and leave a margin for the payment of income taxes. However, the terms of the notes required that annual payments of principal and interest be paid whether dividends were declared or not. The directors were under a duty to present the facts to the shareholders, but they were under no obligation to indulge in prophesy or optomistic forecast in respect to the payment of dividends during the life of the loans.

█ Plaintiff's next complaint is directed against the size of the loan and the terms upon which it was granted. He contends that the loan of $900,000 resulted in a serious depletion of needed working capital of the corporation. There is testimony, however, that at the time the loan was made the corporation's working capital amounted to upwards of $50,000,000. Apparently it was the judgment of the board of directors that a loan of $900,000 would not prevent, or seriously interfere with, the profitable operation of the corporation's business. That this judgment was sound is evidenced by the company's remarkable record of profitable operations in the ensuing years. That the terms of the loan were unusually generous, as plaintiff con-

tends, must be conceded. However, the shareholders were informed fully as to the rate of interest and the exemption of the borrowers from personal liability as well as other material terms of the loan. In these circumstances it does not lie within the province of this Court to override the shareholders' ratification. Plaintiff directs his heaviest fire against what he claims to be the "lack of consideration for the corporation's act." He contends that the stock ownership of the three directors in Hanna was an adequate incentive for their best efforts as executive officers of Pittsburgh. While this indirect interest in Pittsburgh undoubtedly supplied an incentive to the three directors, it was considered by the Board that a direct proprietary interest in the corporation would provide an added stimulus to their efforts and insure the company of their continued services in the management of its affairs. Encouragement of effort and the retention of services of valuable employees are the basic considerations of all incentive plans. It is plaintiff's position, however, that consideration to the corporation was lacking because there was no assurance by way of contracts of employment or otherwise that the three directors would continue in the employ of the company. In support of this contention plaintiff cites and relies upon cases involving stock options in which incentive plans were struck down by the courts because the prospective optionees had not contracted to remain with the company for any specific length of time. Frankel v. Donovan, Del.Ch.1956, 120 A.2d 311; Kerbs v. California Eastern Airlines, 1952, 33 Del.Ch. 69, 90 A. 652. It should be noted, however, that in Frankel v. Donovan, supra, the court held that there was nothing in the plan *or the surrounding circumstances* which reasonably assured the corporation that it would get what it bargained for. Kerbs v. California Eastern Airlines, supra, is to the same effect.

Here the surrounding circumstances supplied strong assurance that the three directors would remain with the corporation. Each of them had long been associated with corporations that were engaged in the coal business. Each of them had specialized knowledge of that business. It was largely through their efforts that the old Pittsburgh Coal Company and The Consolidated Coal Company were merged and the assets of The Hanna Coal Company acquired. Under their management these units were welded together in a highly profitable business enterprise which has become the largest coal company in the world. Their acquisition of a substantial proprietary interest in the corporation rendered it highly probable that the three directors would continue indefinitely as part of the management of the corporation. Love and Ireland are still with the corporation. Humphrey continued as Chairman of the board of directors until he became Secretary of the Treasury in President Eisenhower's cabinet. There was no lack of assurance that the corporation "would get what it bargained for."

Plaintiff asserts several other grounds of attack upon the transaction. A separate consideration of each of such grounds would serve no purpose except to unnecessarily extend an opinion already too long. It is sufficient to say that all of these grounds have been carefully considered and found to be without merit. The transaction in question produced handsome profits for the three directors. However, it is abundantly clear that if the sale of the shares had not been made those profits would have been realized by Hanna rather than by Pittsburgh. In effect the transaction was a sale of stock by Hanna to the three directors who borrowed a substantial portion of the purchase price from Pittsburgh. The terms of the sale as set forth in the Proxy Statement indicated plainly that Pittsburgh was not acquiring the stock as an asset but solely on condition that the shares would be transferred to the three directors without profit to Pittsburgh. The terms of the loans were unusually favorable to the borrowers but they were approved by the unanimous vote of disin-

terested directors and by a substantial majority of disinterested shareholders.

For the reasons stated above this cause of action is dismissed on the merits as to Humphrey and Ireland. Love is not a party and of course there can be no adjudication as to him.

### Laches

Plaintiff had full knowledge of the terms of the transaction at the time it was presented to the shareholders for ratification but took no action until more than 3 years thereafter. At the time this action was commenced the shares had more than doubled in value and the positions of Hanna, Pittsburgh and the three directors had changed substantially in reliance upon the shareholders' approval. In view of the fluctuating character of the subject matter of the transaction and the substantial changes of positions of the parties participating therein it would be inequitable to permit plaintiff to maintain this cause of action after a delay of 3 years which, under the circumstances, was unreasonable. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328; Bonini v. Family Theater Corp., 327 Pa. 273, 194 A. 498; Graff v. Williamsport Water Co., 312 Pa. 255, 167 A. 341. I therefore hold that defendants are entitled to judgment on the third cause of action on the additional ground of plaintiff's laches.

It should be added that for the reasons hereinbefore stated in connection with the second cause of action I find that plaintiff has justified his failure to make demand on the board of directors or shareholders before commencing suit on this cause of action.

"Plaintiff seeks no affirmative relief on the Fourth Cause of Action and has offered no evidence in support of the allegations of said cause of action. The Fourth Cause of Action is therefore dismissed with prejudice."

Counsel may prepare and submit a decree within 20 days.